GENERAL HOUSEWARES CORP. and Chicago Cutlery, Inc., Appellants,

v.

NATIONAL SURETY CORPORATION,[1]
Appellee.

No. 49A04–9906–CV–282.

Court of Appeals of Indiana.

Dec. 28, 2000.

---

1. CNA Insurance Companies, Continental Casualty Company, Continental Insurance Company, Federal Insurance Company, Fireman's Fund Insurance Companies, General Star National Insurance Company, Great Northern Insurance Company, Harbor Insurance Company, Hartford Accident & Indemnity Company, International Insurance Company, Liberty Mutual Insurance Company, North Star Reinsurance Company, Northbrook National Insurance Company, Transportation Insurance Company, United States Fidelity & Guaranty, United States Fire Insurance Company, and Zurich Insurance Company were parties to the litigation in the trial court and are nominal appellees in this appeal.

George M. Plews, Jeffrey D. Claflin,
Thomas A. John, Indianapolis, Indiana,

Koorosh Talieh, Howrey & Simon, Washington, D.C., Attorneys for Appellants.

Thomas W. Murphy, Caron, Constants & Wilson, Chicago, Illinois, Bruce L. Kamplain, Raymond L. Faust, Norris, Choplin & Schroeder, LLP, Indianapolis, Indiana, Attorneys for Appellee National Surety Corporation.

## OPINION

SULLIVAN, Judge

Appellants, General Housewares Corporation and its wholly owned subsidiary, Chicago Cutlery, Inc., (collectively "Housewares"), challenge the trial court's entry of summary judgment in favor of National Surety Corporation (National).

We reverse and remand.

The facts relevant to this appeal reveal that Housewares manufactured cookware and precision tools at four locations: Terre Haute, Indiana, Sidney, Ohio, Lexington, Kentucky, and Antrim, New Hampshire. Housewares purchased three comprehensive general liability (CGL) insurance policies from National. The first of these policies, number S 64 DXX 80589089, provided coverage from March 1, 1994 through March 1, 1995. The policies numbered S 64 DXX 80614056 and XSC–000–8231–4808 provided coverage from March 1, 1995 through March 1, 1996.

Housewares' largest manufacturing plant is located in Terre Haute, Indiana. During the time relevant to this appeal, Housewares manufactured enamel-coated cookware at the Terre Haute facility. During an inspection of the site, the Indiana Department of Environmental Management (IDEM) took samples of sludge that had formed as a result of "wet dipping" the cookware in enamel and determined that the samples contained unacceptable levels of barium and cadmium. As a result, IDEM sent Housewares a "Notice of Violation" on February 9, 1989. In September 1989, Housewares entered into an Agreed Order wherein it agreed to an extensive cleanup of the site and to pay

IDEM a fine of $36,339. IDEM's commissioner approved the agreement on January 19, 1990. On November 24, 1992, Housewares submitted its first proposed closure plan to IDEM. After negotiations, IDEM finally accepted a revised closure plan on September 26, 1994. Housewares continued to spend funds for monitoring and cleanup of the site up to the time of this appeal. Although Housewares submitted a closure certification report to IDEM on November 27, 1995, IDEM issued a deficiency notice on March 14, 1996. At the time of this appeal, IDEM still had not certified closure as to the site.

Housewares also owned and operated a manufacturing facility in Sidney, Ohio. On December 5, 1990, Housewares notified the Ohio Environmental Protection Agency (Ohio EPA) of the possible disposal of an unknown amount of sludge, which may have contained lead, at the Sidney foundry and landfill. On February 19, 1991, the Ohio EPA inspected the site. Thereafter, on March 20, 1991, the Ohio EPA sent Housewares a letter stating that Housewares had unlawfully disposed of hazardous waste at the Sidney site. The letter listed fourteen separate violations and advised Housewares to submit a closure plan. Housewares responded by denying that it had violated any regulations. After further investigation by the Ohio EPA, Housewares entered into a final order in February 1993 requiring Housewares to close the contaminated site, determine the lead concentrations levels, submit a closure plan, and pay a fine of $30,000.

On March 14, 1994, Housewares submitted its closure plan to the Ohio EPA, which the Ohio EPA approved on September 29, 1994. On August 19, 1996, Housewares submitted a closure certification report, noting that the cleanup activities at the site had been completed on June 21, 1996.

Housewares also leased property located in Lexington, Kentucky from the Bekem Partnership. Housewares sublet this

property to Sam Blount, who operated a furniture manufacturing plant. This manufacturing plant generated waste products containing unacceptable levels of cadmium, chromium, and lead. On January 25, 1988, the Kentucky Natural Resources and Environmental Protection Cabinet (KEPC) filed an administrative complaint with regard to the Lexington site and named Housewares as a defendant. Despite denying liability in the matter, Housewares, the Bekem Partnership, and KEPC entered into an agreed order on December 8, 1992. In this order, Housewares and Bekem agreed to remove an underground storage tank from the site. After the removal of the storage tank, samples were taken from the pit. These samples indicated the presence of volatile compounds, and the Kentucky Division of Waste Management required further investigation to determine the extent of the contamination. Thereafter, Housewares filed a motion to set aside the agreement, claiming unfairness in the process since the agreed order had been entered. This motion was denied on January 26, 1996.

The Bekem Partnership continued to spend considerable funds in remediating the Lexington site, and attempted to have Housewares pay for one-half of the expenses. Although it maintains it is not liable for any of these costs, Housewares was negotiating with the Bekem Partnership to settle the matter at the time of this appeal.

On December 29, 1986, Housewares bought a facility located in Antrim, New Hampshire from Strombeck Manufacturing Company. Strombeck had purchased the facility from the Goodell Company, which had owned the site from 1875 to 1982. Housewares manufactured knives at the site, but ceased using the site in 1989.

On May 18, 1993, the United States Environmental Protection Agency (EPA) advised Housewares that, in response to a citizen complaint, the Antrim site had been placed on the EPA's inventory of known or potential hazardous waste disposal areas.

On July 19, 1993, the EPA, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), notified Housewares that it was a potentially responsible party (PRP) with regard to the Antrim site. The letter read in pertinent part:

"Unless a potentially responsible party ("PRP") or parties commit to properly performing or financing [cleanup actions], EPA may perform these actions pursuant to Section 104 of CERCLA, 42 U.S.C. § 9604.

* * *

EPA has evaluated evidence gathered during investigations of the Site. *Based on this evidence, EPA has information indicating that you are a potentially responsible party* under Section 107(a) of CERCLA with respect to the Site. Specifically, EPA has reason to believe that General Housewares is the owner/operator of the Site. By this letter, EPA notifies you [of] your potential liability and urges you to voluntarily perform or finance those response activities that EPA determines are necessary at the Site."

Record at 328–329 (original emphasis).

On July 27, 1993, Housewares sent a letter to the EPA agreeing to voluntarily remedy the situation as per the PRP notice. The next day, on July 28, 1993, Housewares began sampling, analyzing, and disposing of the contents of containers at the site. On August 17, 1993, the EPA informed Housewares that soil samples taken from the Antrim site contained unacceptable levels of hazardous materials and indicated that removal of the contaminated soil would be necessary. The letter stated that the cleanup "must be performed pursuant to an administrative order." Record at 343. After a meeting between the EPA, the New Hampshire Department of Environmental Services (DES), and Housewares, the EPA on October 1, 1993, formally delegated to the

DES the responsibility of overseeing the cleanup efforts at the Antrim site.

On October 8, 1993, Housewares filed a complaint in the United States District Court for the District of New Hampshire against David Hurlin and Peter Boorum, who were also PRPs with regard to the Antrim site. Housewares sought contribution and indemnification pursuant to CERCLA, New Hampshire statute, and common law for the expenses it had incurred as a result of the remediation efforts.

On December 2, 1993, the DES sent an "Environmental Assessment" to Housewares which outlined certain areas of concern which needed further investigation. This assessment letter noted that state statutes and regulations impose strict liability for costs relating to the remediation of a contaminated site upon any party that directly or indirectly owns or controls a facility where hazardous wastes have been generated or improperly disposed. The DES also advised Housewares that it was responsible for any costs incurred as a result of the cleanup, and would have to repay the EPA's past costs as well.

On October 31, 1994, the federal district court denied a motion for summary judgment which had been submitted by defendant David Hurlin. In its order, the District Court noted that Housewares "admits its liability under CERCLA" with regard to the Antrim site. Record at 398. The DES finally approved Housewares' cleanup plan on August 11, 1994. On July 21, 1995, the DES approved a remedial scope of work plan submitted by Housewares, and directed Housewares to commence cleanup activities. On January 16, 1996, Housewares submitted a report of its removal activities. Finally, on December 10, 1996, the DES informed Housewares that the Antrim site had been remediated with regard to exterior heavy metal contaminated residues and soils, interior waste residues, and asbestos. However, the DES required Housewares to document any lead contamination, limit further use of the site, and perform more groundwater sampling.

On June 12, 1997, Housewares brought an action for declaratory relief, breach of contract, and damages against several insurance companies which had issued CGL policies to Housewares. National was named as a defendant in this action. On October 16, 1998, National filed a motion for summary judgment asserting the "known loss" defense. Housewares filed a motion in opposition on January 26, 1999. After a hearing on the motion for summary judgment as to the issue of known loss, the trial court issued an order granting summary judgment in favor of National on May 14, 1999. Housewares now appeals.

### Standard of Review

Summary judgment is appropriate only where the designated evidentiary material demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Jones v. Western Reserve Group/Lightning Rod Mut. Ins. Co.* (1998) Ind.App., 699 N.E.2d 711, 713, *reh'g denied, trans. denied*. Genuine issues of material fact exist where facts concerning an issue which would dispose of litigation are in dispute. *Id.* at 713–14. On appeal, we must carefully scrutinize an entry of summary judgment to ensure that the non-prevailing party is not denied his or her day in court. *Id.* We must apply the same standard as the trial court and resolve disputed facts or inferences in favor of the non-moving party. *Id.* The burden is upon the moving party to establish, prima facie, that no genuine issues of material fact exist and that he or she is entitled to judgment as a matter of law. *Chance v. State Auto Ins. Co.* (1997) Ind.App., 684 N.E.2d 569, 570, *trans. denied*. Only then does the burden fall upon the non-moving party to respond by setting forth specific facts demonstrating a genuine issue for trial. *Id.*

Housewares insists that there were genuine issues of material fact and that National was not entitled to judgment as a matter of law. Thus, we must first determine the legal issues involved, and then determine if facts relevant to these issues are in dispute. *Bolin v. State Farm Fire and Cas. Co.* (1990) Ind.App., 557 N.E.2d 1084, 1085, *trans. denied.*

### The Known Loss Doctrine

Housewares claims that the trial court erred by applying the "known loss" doctrine to its third-party liability insurance policies. Both parties claim, and our research reveals, that no Indiana court has recognized this doctrine. Therefore, this is a matter of first impression in Indiana.

The "known loss" doctrine is a common law concept deriving from the fundamental requirement in insurance law that the loss be fortuitous. *Pittston Co., Ultramar America Ltd. v. Allianz Ins. Co.* (1997) 3d Cir., 124 F.3d 508, 516. Simply put, the known loss doctrine states that one may not obtain insurance for a loss that has already taken place. *Id.* Describing the known loss doctrine, commentators have noted that "losses which exist at the time of the insuring agreement, or which are so probable or imminent that there is insufficient 'risk' being transferred between the insured and insurer, are not proper subjects of insurance." 7 LEE R. RUSS AND THOMAS F. SEGALLA, COUCH ON INSURANCE, § 102:8 at 20 (3d ed. 1997).

■ This principle has been referred to by various names, including "loss in progress," "known risk," and "known loss."[2] RUSS AND SEGALLA, *supra,* § 102:8 at 20. "Loss in progress" refers to the notion that an insurer should not be liable for a loss which was in progress before the insurance took effect. *Id.* Although the term "known loss" has been limited to those situations where a loss has actually

occurred, *see, e.g., Domtar, Inc. v. Niagara Fire Ins. Co.* (1997) Minn., 563 N.W.2d 724, most courts have defined the doctrine to also include losses which are "substantially certain" to occur or which were a "substantial probability." RUSS AND SEGALLA, *supra,* § 102:8 at 21. Despite some differences between the various labels used, we agree with the Illinois Supreme Court, which noted that the term " 'known loss' most adequately describes the doctrine." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.* (1992), 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1209–10. Therefore, we will use the term "known loss" to encompass the fortuity principle.

### General Application of the Known Loss Doctrine

Although the known loss doctrine is recognized by many jurisdictions, there is some disagreement as to how the doctrine should be applied. Some courts have required actual knowledge on the part of the insured. *United States Liab. Ins. Co. v. Selman* (1995) 1st Cir., 70 F.3d 684. Other courts have been less stringent and have required only a "reason to know," or "evidence of probable loss," or determined whether a "reasonably prudent" insured would know that the loss is highly likely to occur. *Missouri Pac. R.R. v. American Home Assur. Co.* (1997), 286 Ill.App.3d 305, 221 Ill.Dec. 648, 675 N.E.2d 1378; *Outboard Marine, supra,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204; *Carter Lake v. Aetna Cas. and Sur. Co.* (1979) 8th Cir., 604 F.2d 1052.

■ In the present case, both parties suggest that the known loss doctrine should depend upon a party's actual knowledge. We agree. The very term "known loss" indicates that actual knowledge upon behalf of the insured is required before the doctrine will apply.[3] This is ordinarily a

---

**2.** Few courts have defined "known risk," and we believe it to be a poor label, as all insureds have some knowledge of a risk of loss, otherwise they would have no reason to seek insur-

ance coverage. *See* RUSS AND SEGALLA, *supra,* § 102:8 at 21.

**3.** However, when determining a party's actual knowledge, courts should keep in mind that

question of fact. *See* RUSS AND SEGALLA, *supra,* § 102:8 at 24.

■ Exactly what the insured is required to know before the known loss doctrine will apply must also be determined. As noted above, there has been no unanimity among courts which have considered this issue. RUSS AND SEGALLA, *supra,* § 102:8 at 23. Some courts merely require knowledge of a "substantial probability" of loss. *See, e.g., Outboard Marine, supra,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d at 1210. The First Circuit, in *Selman, supra,* 70 F.3d at 691, adopted a "substantially certain" test. Although these standards may seem similar, we prefer the language in *Selman* to that of *Outboard Marine.*

■ The term "probability" indicates the presence of contingency and fortuity, the lack of which is the very essence of the known loss doctrine. Even if there is a probability of loss, there is some insurable risk, and the known loss doctrine should not apply.[4] *Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i, Ltd.* (1994), 76 Hawai'i 277, 875 P.2d 894, 920. "Certainty," on the other hand, refers not to the likelihood of an occurrence, but rather to the inevitability of an occurrence.[5] Therefore, a "substantially certain" loss is one that is not only likely to occur, but is virtually inevitable. The inquiry should be more of temporality than probability—when an event will occur, not whether an event will occur. We also note that, because the effect of the known loss doctrine is to avoid coverage, the burden of proving that the loss was known is on the party seeking to avoid coverage. *See Sutton v. Roth, Wehrly,*

*Heiny, Inc.* (1981) Ind.App., 418 N.E.2d 229, 232 (holding that, in a breach of contract action, defendant has burden of proof on any matters of avoidance) *trans. denied.* Therefore, we hold that if an insured has actual knowledge that a loss has occurred, is occurring, or is substantially certain to occur on or before the effective date of the policy, the known loss doctrine will bar coverage. This is not to say, however, that parties may not explicitly agree to cover existing losses. Indeed, the known loss doctrine is inapplicable "if the insurer also knew of the circumstances on which it bases the defense." RUSS AND SEGALLA, *supra,* § 102:8 at 23.

### Applicability of the Known Loss Doctrine to Housewares' Policies

■ Housewares properly notes that exceptions, limitations, and exclusions in an insurance policy must be plainly expressed. *Erie Ins. Co. v. Adams* (1997) Ind.App., 674 N.E.2d 1039, 1041, *trans. denied.* Apparently, there is no language in Housewares' policies concerning the known loss doctrine.[6] Thus, Housewares insists that the known loss doctrine should not be applied to its policies. We disagree.

■ As earlier noted, fortuity is a concept inherent to insurance. "Insurance has been defined as a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an *unknown or contingent event.*" *Meyer v. Building and Realty Serv. Co.* (1935) 209 Ind. 125, 134, 196 N.E. 250, 253–54, *trans. denied* (emphasis supplied). "Implicit in the concept of insurance is

a party may not intentionally turn a blind eye in order to avoid application of the known loss doctrine.

4. Indeed, insurance premiums are based upon the likelihood of an occurrence. If insurers believe the likelihood of a loss is exceptionally high, they may adjust the premium rates accordingly.

5. "Certain" has been defined as "In such a condition or position that failure (to happen

or to do a specific thing) is impossible; incapable of failing; destined; sure." WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1939).

6. Appellant's Brief contains no citation to the policies in the record; nor could we find in the record any copies of the policies in question. However, both parties seem to agree that the policies in question contain no language concerning known losses.

that the loss occur as a result of an event that is fortuitous, rather than planned, intended, or anticipated." RUSS AND SEGALLA, *supra*, § 102:7 at 17. Insurance is "applicable only to some contingency or act to occur in [the] future." BLACK'S LAW DICTIONARY 721 (5th ed. 1979). Thus, the known loss doctrine is not so much an exception, limitation, or exclusion as it is a principle intrinsic to the very concept of insurance. *See* RUSS AND SEGALLA, *supra*, § 102:9 at 25. Therefore, despite the fact that the policies at issue failed to mention the known loss doctrine, we hold that it is applicable to these policies.

■ Next, Housewares contends that recent decisions by courts in Indiana have favored the rights of the insured to recover costs in responding to environmental cleanups required by law. In support of this contention, Housewares cites *American States Ins. Co. v. Kiger* (1996) Ind., 662 N.E.2d 945; *Seymour Mfg. Co., Inc. v. Commercial Union Ins. Co.* (1996) Ind., 665 N.E.2d 891; *Hartford Accident and Indem. Co. v. Dana Corp.* (1997) Ind. App., 690 N.E.2d 285, *trans. denied; Travelers Indem. Co. v. Summit Corp.* (1999) Ind.App., 715 N.E.2d 926; and *Governmental Interinsurance Exch. v. City of Angola* (1998) N.D.Ind., 8 F.Supp.2d 1120. However, in none of these cases was there any claim that the insured knew of the loss before coverage incepted. It is true that Indiana courts favor coverage when interpreting ambiguities in insurance policies, particularly where a policy excludes coverage. *See Kiger, supra* at 947. Nevertheless, as noted above, the known loss doctrine embodies the fundamental requirement of fortuity in insurance and is therefore applicable to all insurance contracts, unless expressly stated otherwise.

■ Housewares also contends that the known loss doctrine should not apply to its policies with National because these policies cover third-party liability. We do not find this argument persuasive. Courts have rejected claims that the known loss doctrine should apply only to first-party insurance or only to third-party liability insurance.[7] *See* RUSS AND SEGALLA, *supra*, § 102:8 at 20. Similarly, we can find no valid reason for distinguishing between the two types of policies with regard to the known loss doctrine. One who knows of a loss or a liability, whether as a first or third party, should not be allowed to insure against either. Therefore, the known loss doctrine is applicable to third-party liability insurance policies such as those at issue.

■ Nevertheless, Housewares insists that the element of fortuity is sufficiently addressed by the explicit language of its insurance policies, and therefore, the known loss doctrine is inapplicable in the present case. Apparently, the policies in question limit coverage to "occurrences" which are neither "expected" nor "intended" by the policyholder.[8]

■ An occurrence is expected when the insured acted although he was aware that the harm caused by his action was practically certain to occur. *Bolin, supra,* 557 N.E.2d at 1086 (quoting *Indiana Farmers Mut. Ins. Co. v. Graham* (1989) Ind.App., 537 N.E.2d 510, 512). In the same context, our Supreme Court has defined intentional as "the volitional performance of an act with an intent to cause injury, although not necessarily the precise injury or severity of damage that in fact occurs." *Allstate Ins. Co. v. Herman* (1990) Ind., 551 N.E.2d 844, 845 (quoting *Home Ins. Co. v. Neilsen* (1975) 165 Ind.

---

7. First-party insurance is "[i]nsurance which applies to the insured's own property or person." BLACK'S LAW DICTIONARY 722 (5th ed. 1979). In contrast, liability insurance "indemnifies against liability on account of injuries to the person or property of another." *Id.* at 723.

8. Again, while both parties seem to agree that the policies in question contained such language, Appellant's Brief contains no citation to the policies in the record; nor could we find a copy of the policies in the record.

App. 445, 448, 332 N.E.2d 240, 242, *trans. denied*).

Housewares claims that applying the known loss doctrine would render the "expected or intended" language superfluous. In support of its position, Housewares cites *Owens–Corning Fiberglas Corp. v. American Centennial Ins. Co.* (1995) 74 Ohio Misc.2d 183, 660 N.E.2d 770, 778 and *Monsanto Co. v. Aetna Cas. and Sur. Co.* (1993) Del.Super.Ct., No. 88C–JA–188, slip op. at 55–56. In these cases, the courts refused to apply the known loss doctrine because of language in the policies which limited coverage to occurrences which were not expected or intended. These courts concluded that the element of fortuity was sufficiently addressed in the "expected or intended" language. We disagree.

The "expected or intended occurrence" exclusions and the known loss doctrine serve different functions. The expected or intended exclusions focus upon the time of the act for which insurance is sought, while the known loss doctrine looks to the time the insurance contract is entered into.[9] The Second Circuit summarized the distinction:

> "The 'expected or intended' claim requires consideration of whether, *at the time of the acts causing the injury,* the insured expected or intended the injury, an inquiry that generally asks merely whether the injury was accidental. The 'known loss' defense requires consideration of whether, *at the time the insured bought the policy (or the policy incepted),* the loss was known. The contentions may overlap, but they are distinct...."

*Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.* (1995) 2d Cir., 73 F.3d 1178, 1215 (citations omitted) (emphasis supplied) *modified on other grounds by* (1996) 85 F.3d 49. Because Housewares insured against liability to a third party and not property damage, we look to see if the insured knew of a liability, rather than whether property damage was known. *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995), 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, 905.

Housewares claims that the known loss doctrine should not apply in the present case because, although it may have known of conditions which could lead to liability, its liability was "unknown" until it was fixed in amount. Housewares argues that, because it was not aware (and in some cases is still not aware) of the full extent of its liability, the known loss doctrine is inapplicable to it policies. We disagree.

In support of its position that, before the known loss doctrine may be applied, the full extent of liability must be known, Housewares cites *CPC Int'l, Inc. v. Hartford Acc. and Indem. Co.* (1998), 316 N.J.Super. 351, 720 A.2d 408, 422, *certification denied* (1999) 158 N.J. 73, 74, 726 A.2d 937, wherein the court stated, "As long as there remains uncertainty about damage or injury that may occur during the policy period and the imposition of liability upon the insured, and no legal obligation to pay third party claims has been established, ... there is a potentially insurable risk for which coverage may be sought." Notwithstanding this view, we hold that there is a distinct difference between knowledge of the existence of liability and knowledge of the full extent of liability.

---

9. An example will illustrate the differences between the "expected or intended occurrence" exclusion and the known loss doctrine. If an individual in an automobile intentionally runs down a pedestrian, the occurrence would be "expected or intended," and therefore excluded from coverage under an existing insurance policy. The known loss doctrine would prevent such an individual from purchasing insurance to cover this incident after the fact. If an individual accidentally runs down a pedestrian, coverage would not be excluded on the basis of any "expected or intended" language under an existing policy. However, the known loss doctrine would still prevent this negligent party from purchasing insurance to cover an accident that has already occurred.

The existence of liability can be known without the full extent of liability being fixed. For example, if one negligently injures a pedestrian with one's automobile, one's liability is substantially certain. However, it may be months before the dollar amount of liability is certain, and the known loss doctrine bars purchasing insurance after the accident. An insured's liability need not be fixed to a monetary certainty; if the known liability has occurred or is substantially certain to occur, the known loss doctrine bars coverage.

### Propriety of Summary Judgment

■ Having identified the legal issues involved, we must now determine whether any material facts relevant to these issues are in dispute. *Bolin, supra,* 557 N.E.2d at 1085. Summary judgment is inappropriate even if the trial court believes that the non-moving party will be unsuccessful at trial. *Jones, supra,* 699 N.E.2d at 713–714. Summary judgment may not be entered if conflicting inferences arise from the undisputed facts. *Id.* at 714. To prevail, the appealing party must establish the existence of a genuine issue of material fact from those materials designated to the trial court. *Id.* at 713. The application of the known loss doctrine in this case depends upon whether Housewares, through its agents, had actual knowledge that liability was substantially certain prior to the inception of the National insurance policies. *See United Theological Seminary v. Estate of Burkhart* (1986) Ind.App., 494 N.E.2d 361, 366 (noting that a corporation works exclusively through the acts of its agents) *trans. denied.*

■ The designated materials demonstrate that, on September 5, 1989, Housewares entered into a final order with IDEM relating to the cleanup of the Terre Haute site. In this order, Housewares, acting through its President, agreed to an extensive cleanup of the site and agreed to pay IDEM a fine of $36,339. This establishes, prima facie, that prior to the inception of the first National policy on March 1, 1994, Housewares actually knew that liability at the Terre Haute site was not only substantially certain to occur, but had indeed occurred. That Housewares did not know the final extent of its liability is of no import.

With regard to the Sidney, Ohio site, the designated materials reveal that, on February 25, 1993, Housewares, acting through its Vice President of Operations, entered into a final order with the Ohio EPA requiring Housewares to close the contaminated site, determine the lead concentration levels, submit a closure plan, and pay a fine totaling $30,000. This establishes, prima facie, that despite its denial of liability, Housewares actually knew that a liability had occurred at the Sidney site well in advance of the inception of any National policy.

The designated materials also show that on December 8, 1992, Housewares, acting through an authorized agent, the Bekem Partnership, and the Kentucky Natural Resources and Environmental Protection Cabinet signed an order wherein Housewares and Bekem agreed to remove an underground storage tank from the Lexington site. Housewares claims that this order "established, at most, General Housewares' liability for part of the cost of removing the underground storage tank." Appellant's Brief at 13. We agree. Housewares, by agreeing to a cleanup of the Lexington site, assumed partial liability. This establishes, prima facie, that Housewares actually knew that it had incurred some liability at this site prior to the inception of the first National policy.

On July 19, 1993, the EPA notified Housewares that it was a potentially responsible party (PRP) with regard to the Antrim site. The receipt of this notice does not establish actual liability. *See Montrose, supra,* 10 Cal.4th 645, 42 Cal. Rptr.2d 324, 913 P.2d at 904 (holding that receipt of a PRP letter was insufficient to defeat coverage under the "loss-in-progress" rule). As its name suggests, this letter merely informed Housewares of its

*potential* liability. *Id.* After receiving the PRP letter, Housewares agreed to remediate the site. Then, on December 6, 1993, Housewares received a letter from the New Hampshire DES which informed Housewares that it was strictly liable under New Hampshire law for any cleanup involved at the Antrim site.[10] Whereas the PRP letter informed Housewares of its *potential* liability, the DES letter established that Housewares, as the owner of the Antrim site, was *strictly liable* for the costs of the cleanup of that site.

However, both CERCLA and the New Hampshire statutes allow a party to recover cleanup costs from another liable party. 42 U.S.C. 9606(b)(2), 42 U.S.C. 9613(f)(1), N.H. RSA 147–B:10.[11] Thus, although Housewares was strictly liable for cleanup costs at the Antrim site, the extent to which it would have to bear the burden of the expense was yet to be determined. Again, the extent of Housewares' liability is not the determinative issue. Housewares had received a letter informing it of the existence of its liability. This establishes that Housewares, through its agent, had been informed by the DES that it was to be held strictly liable for the costs of cleaning up the Antrim site. Thus, almost three months before the inception of the first National policy on March 1, 1994, Housewares had knowledge that liability at the Antrim site was substantially certain to occur.

Having determined that National met its initial burden upon summary judgment, we must now determine whether Housewares designated evidence demonstrating a genuine issue of material fact for trial with regard to its knowledge of liability at the locations in question. We hold that it has not. Housewares simply points to evidence demonstrating that it did not know the full extent of its liabilities, but as we have already noted, this is not the issue. After reviewing the designated evidentiary materials, we hold that Housewares has not demonstrated a genuine issue of material fact concerning its knowledge of liability at the Terre Haute, Sidney, Lexington, and Antrim sites. Therefore, a partial summary judgment as to the issue of Housewares' knowledge of liability would have been proper, and, were this the only issue, summary judgment in favor of National would have been proper. However, there remains an issue which must still be determined—whether National also knew of any liability Housewares had incurred.

■ Housewares claims that it disclosed its environmental liabilities as part of the underwriting process. Housewares also notes that National makes no claim that Housewares failed to disclose its known liabilities. In support of its claim of disclosure, Housewares designated a 1992–10K form filed with the Federal Securities and Exchange Commission which Housewares says it provided to National. Under the heading "Legal Proceedings" the 10K form states, "For information concerning various environmental matters with which the Company is involved, see

---

**10.** The pertinent portion of the letter read:

"Note that RSA 147–A:9 and RSA 147–B:10 assign strict liability for costs relating to the remediation of a contaminated site to any party that either directly or indirectly owns or controls activities at a facility where hazardous waste has been generated and improperly disposed. Consequently, Chicago Cutlery Manufacturing, Inc. is responsible for costs incurred as a result of remediating site soil and groundwater to acceptable levels. Note further that because the EPA has expended significant resources in preparing to initiate an EPA-lead removal action at the site, they have requested that the DES

include repayment of those costs with remedial requirements at the site. The DES will therefore be forwarding documentation of costs incurred by the EPA and expects Chicago Cutlery, Inc. to reimburse the EPA for their expenditures." Record at 373–374.

**11.** In fact, on October 29, 1996, Housewares settled a suit it had brought against David Hurlin, another PRP at the Antrim site. In the settlement, Hurlin agreed to pay Housewares $350,000 toward cleanup costs at the site, and Housewares agreed to indemnify Hurlin against any further liability as a result of the cleanup efforts.

Note 10 to Consolidated Financial Statements on page 19 of the 1992 Stockholders Report." Record at 665. In our search of the designated materials, we were unable to find a copy of the 1992 stockholders report referred to. Still, construing any inferences of fact in favor of Housewares, this raises the question of whether or not National also had knowledge of Housewares' environmental liabilities prior to issuing the policies. As noted above, the known loss doctrine will not bar coverage where the insurer also knows of the loss. Thus, although Housewares has not demonstrated a genuine issue of material fact with regard to its own knowledge of liability, it has demonstrated a genuine issue as to National's knowledge. If Housewares can prove that National also knew of the environmental liabilities at issue, the known loss doctrine will be inapplicable. Because there is a genuine issue as to a material fact, summary judgment as to the application of the known loss doctrine was improperly granted.

The judgment is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

BAILEY, J., and VAIDIK, J., concur.