# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 09-2519

WEST BEND MUTUAL INSURANCE COMPANY,

*Plaintiff-Appellant,*

*v.*

UNITED STATES FIDELITY AND GUARANTY COMPANY, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:07-cv-00457-RLM-CAN—**Robert L. Miller, Jr.**, *Judge.*

ARGUED DECEMBER 9, 2009—DECIDED MARCH 25, 2010

Before FLAUM, WILLIAMS, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff-appellant West Bend Mutual Insurance Company ("West Bend") appeals from the grant of summary judgment in favor of appellees, who consist of a group of insurance companies that includes the United States Fidelity and Guaranty Company ("Fidelity") and Federated Mutual Insurance Company ("Federated"). West Bend initially sued the defendants for breach of contract because Federated

declined to defend a mutual insured in a class action alleging that insured's gas station contaminated groundwater in a residential neighborhood. The case revolves around whether the pollution exclusion contained in Federated's policy effectively limited coverage for gasoline spills under Indiana law. The district court found that a clause in Federated's policy excluded coverage for this type of claim and granted summary judgment in favor of Federated, Fidelity, and other insurers. West Bend now appeals this judgment as it applies to Federated.

For the following reasons, we affirm.

## I. Background

MDK is a corporation that owned a gas station in Goshen, Indiana, which stored its retail gasoline in underground tanks. In September 1996, MDK notified the Indiana Department of Environmental Management ("IDEM") of a leak from these tanks. Over the following years, MDK procured a variety of monitoring and engineering services designed to control and repair the leak. In 1998, MDK sold the gas station to Southland Corporation.

During the period when it owned the gas station, MDK held insurance coverage from a series of companies: Fidelity from 1980 to 1990, Indiana Insurance from 1990 to 1995, West Bend from December 1995 to 2001, and Federated from 2001 to 2003. In September 2002, the Bowens family and other individuals who lived near

the gas station commenced a class action lawsuit ("the *Bowens* action") against a group of defendants that included MDK. Plaintiffs alleged that gasoline had leaked into groundwater and migrated beneath the nearby Jackson Street neighborhood, causing personal injury and property damage to people whose homes were inundated with toxic fumes.

In September 2002, MDK requested that West Bend provide it with a defense; West Bend complied, subject to a reservation of rights to dispute coverage. MDK made a similar request to Federated, which declined coverage on the grounds that its policy featured a pollution exclusion as well as other coverage limitations. Eventually, West Bend paid $4 million to settle the class action.

The case before us centers on whether the Federated insurance policy covered claims put forth in the *Bowens* action. Federated provided a commercial general liability policy ("CGL") to MDK from October 1, 2001 to October 1, 2003, which insured the company from liability to others for property damage and bodily injury occurring within the policy period. The policy stated:

> 1. Insuring Agreement
>
> a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.
>
> . . .

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) [*The Known Loss Exclusion*] Prior to the policy period, no insured . . . knew that the "bodily injury" or "property damage" had occurred, in whole or in part. . . .

c. [*Continuous Injury Endorsement*] "Bodily injury" or "property damage" which occurs [sic] during the policy period and was not, prior to the policy period, known to have occurred by any insured . . . includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

The policy then stipulated that bodily injuries or property damage occur at the earliest time the insured learns about them. A coverage limitation endorsement further provided that the policy "does not apply to, and the Company shall have no duty to defend, any claim seeking 'bodily injury' or 'property damage' that occurred before the policy period, regardless of whether that 'bodily injury' or 'property damage' is also deemed to have occurred during the policy-period of this policy."

The Federated policy featured a Pollution Exclusion Endorsement, which excluded coverage for the following:

f. Pollution [*The Pollution Exclusion*]

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

. . .

(f) At or from any tank, piping, pumps or dispensers at premises, sites or locations in addition to those described in subparagraphs (a), (b), (d) or (e), which are or were at any time owned, leased, installed, removed, tested, repaired or filled by or on behalf of any insured, wherever located (except at residences primarily used for dwelling purposes) which contain, transport or dispense or are designed to contain, transport or dispense:

(I) motor fuels;

(ii) kerosene;

(iii) lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of any "auto," "mobile equipment," watercraft or aircraft; or

(iv) waste lubricants or other operating fluids which are or were needed to perform the normal, electrical, hydraulic or mechanical functions necessary for the operation of any "auto," "mobile equipment", watercraft or aircraft;

> including, but not limited to, their constituent parts and other irritants or contaminants found therein.
>
> . . .
>
> Motor fuels means petroleum or a petroleum-based substance that is typically used in the operation of a motor or engine, including but not limited to gasoline, aviation fuel, number one or number two diesel fuel, or any grade of gasohol. [*"Motor Fuels" Definition*]

In a separate part of the policy that defines quoted terms, Federated stated that "pollutants" mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." Notably, this definition did not specifically include gasoline.

The Federated policy also included an Indiana Changes Endorsement, which stated that the Federated Pollution Exclusion "applies whether or not such irritant or contaminant has any function in your business, operations, premises, site or location." In addition to the CGL policy, MDK held "Umbrella" excess liability and "products-completed operations hazard" coverage from Federated. The former tracked the scope of the CGL, while the latter supplemented it.

The district court ruled from the bench in favor of defendants-appellees because "the pollution exclusion in the . . . policy bars a defense in coverage." It did not

reach the issue of whether the Known Loss Exclusion also preempted West Bend's claim, but it did conclude that the products-completed operations hazard coverage was not an alternative source of an obligation to defend the *Bowens* action.

## II. Discussion

We review a district court's grant of summary judgment de novo. *First Nat'l Bank v. Cincinnati Ins. Co.*, 485 F.3d 971, 976 (7th Cir. 2007). A grant of summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Indiana law governs this case and our task is to interpret the Federated policy accordingly. To do so, "[w]e construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases, or paragraphs." *Briles v. Wausau Ins. Cos.*, 858 N.E.2d 208, 213 (Ind. Ct. App. 2006). Generally, we give words their ordinary meaning, *Holtzclaw v. Bankers Mut. Ins. Co.*, 448 N.E.2d 55, 59 (Ind. Ct. App. 1983), though where ambiguity exists, we read insurance policies strictly against the insurer. *Fid. & Deposit Co. of Md. v. Pettis Dry Goods Co.*, 190 N.E. 63, 65 (Ind. 1934).

Under Indiana law, the insurer's duty to defend is broader than his contractual obligation to provide coverage, but this duty is not boundless. "[W]here an insurer's independent investigation of the facts underlying a complaint against its insured reveals a claim patently

outside of the risks covered by a policy, the insurer may properly refuse to defend." *Liberty Mut. Ins. Co. v. Metzler*, 586 N.E.2d 891, 901 (Ind. Ct. App. 1992). That is, when an exclusion precludes coverage, the insurer does not have a duty to defend. *Trisler v. Ind. Ins. Co.*, 575 N.E.2d 1021, 1023 (Ind. Ct. App. 1991).

Of foremost importance in this case is the holding of the Indiana Supreme Court in *American States Insurance Co. v. Kiger*, 662 N.E.2d 945 (Ind. 1996): "[i]f a garage policy is intended to exclude coverage for damage caused by the leakage of gasoline, the language of the contract must be explicit." *Id.* at 949. The court reached this conclusion upon examining a claim factually similar to the one now before us. In *Kiger*, a gas station owner (Kiger) was looking to receive reimbursement from its insurer (American States) for costs associated with cleaning up a gasoline spill from an underground storage tank. The policy in question contained a pollution exclusion that removed coverage for " '[b]odily injury,' 'property damage' or loss, cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants.' " *Id.* at 948. The definition of "pollutants" in the American States policy was identical to that in the policy of Federated: "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." *Id.* Unlike the Federated policy, however, American States made no mention of motor fuels or gasoline elsewhere in its contract.

The *Kiger* court examined the policy in light of its preference for narrowly interpreting exclusions to insurance coverage. *See Pettis Dry Goods Co.*, 190 N.E. at 65. It expressed surprise at the possibility that "an insurance company would sell a 'garage policy' to a gas station when that policy specifically excluded [gasoline,] the major source of potential liability" for the insured. *Kiger*, 662 N.E.2d at 948. Nonetheless, the court remained bound by the rule that "if the policy clearly excludes such coverage, that contract will be enforced," *id.*, and focused on whether American States adequately identified gasoline as an uncovered pollutant.

The court first reasoned that a facial reading of the definition of "pollutants" would eliminate coverage for many routine gas station incidents. For example, Kiger would not be covered against a personal injury suit by a customer who slipped on an oil slick because oil was ostensibly a chemical within the scope of the exclusion. The Indiana Supreme Court next observed that gasoline is not necessarily a pollutant from the perspective of a gas station owner who dedicates his days to selling the substance. That is, the gasoline in question burned just fine and lacked foreign "contaminants." Only when it accidentally seeped out of the gas station did it become a contaminant itself, leading to an ambiguity about whether the pollution exclusion could apply to a substance that was not acting as a pollutant for the bulk of the insurance term. The court determined that the policy did not resolve this ambiguity and proceeded to interpret it against the defendant drafter and in favor of coverage. The *Kiger* opinion summarized this position

with the previously cited rule requiring explicit exclusion of gasoline from garage policies.

The validity of the district court's decision comes down to whether the Federated policy satisfies the *Kiger* requirement for explicit contracts. Predictably, West Bend and Federated differ in their interpretation of this requirement. Appellants argue that "liability policies sold to gasoline retailers, if they were to exclude liability for gasoline contamination, should explicitly define 'pollutant' to include gasoline." Appellees instead assert that the *Kiger* standard is satisfied whenever the totality of the policy explicitly excludes gasoline, relying on the words of the decision itself, the rule that contracts must be construed as a whole, and Indiana's decision to place a duty on insureds "to read and to know the contents of their insurance policies." *Safe Auto Ins. Co. v. Enter. Leasing Co. of Indianapolis, Inc.*, 889 N.E.2d 392, 397 (Ind. Ct. App. 2008).

Appellants' argument does not stand up to scrutiny. A fair reading of *Kiger* cannot lead to the conclusion that the explicit exclusion must be located in one particular part of the policy. Such an outcome would be anomalous in light of broad norms of contract interpretation and illogical when considering the motivation of the *Kiger* court. While the definition of "pollutants" in the Federated policy is identical to the one Indiana courts evaluated in *Kiger*, the Federated Pollution Exclusion itself clearly includes motor fuels, which the "Motor Fuels" Definition then explicitly applies to gasoline ("Motor fuels means petroleum or a petroleum-based substance

that is typically used in the operation of a motor or engine, including but not limited to gasoline . . . ."). The plain language of the contract thus explains that Federated will not cover property damage or personal injuries related to gasoline. This conclusion is buttressed by the fact that the Indiana Changes Endorsement applies the Pollution Exclusion "whether or not such irritant or contaminant has any function in [MDK's] business, operations, premises, site or location." Together, these provisions eradicate the ambiguities on which *Kiger* rested. A gas station owner presumed by Indiana law to have read the insurance policy would know to a certainty that Federated would not be responsible for damage arising out of gasoline leaks taking place during the covered period.

West Bend cites to *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37 (Ind. 2002), but that case lends little support to appellants' preferred reading of the applicable exclusion standard. In the relevant portion of *Freidline*, the Indiana Supreme Court summarily affirmed a lower court's conclusion that a definition of "pollutants" identical to the one in the Federated policy and *Kiger* could not exclude coverage for "fumes emanating from carpet glue." *Id.* at 40. The text of *Freidline*, however, suggests that the Supreme Court did not focus solely on the individual definition clause in arriving at its conclusion. In fact, the brevity of the discussion indicates most strongly that *nothing* in the Shelby Insurance contract as a whole provided grounds for denying coverage, making it unnecessary for the court to discuss each of the irrelevant provisions in any detail. Similarly, in *Travelers*

*Indemnity Co. v. Summit Corp.*, 715 N.E.2d 926, 935 (Ind. Ct. App. 1999), the court concluded that the scope of the policy pollution exclusion was ambiguous after examining both the exclusion itself, which identified methods of release but said nothing about specific substances, and the definition of pollutants, which was again identical to that in *Kiger*.

Finally, the recent decision of the Indiana Court of Appeals in *National Union Fire Insurance v. Standard Fusee Corp.*, 917 N.E.2d 170 (Ind. Ct. App. 2009), is equally unavailing for West Bend. There, the court inquired whether a pollution exclusion substantially similar to the one in *Kiger*, with an identical definition of "pollutant" and no mention of gasoline, tanks, or motor fuels, applied to potential leaks of a chemical involved in the manufacture of flares. It determined that, like in *Kiger*, a facial reading of the sweeping clause would prevent the policy from covering much of anything. The court thus found the exclusion to be ambiguous. Upon applying the presumption that insurance contracts must be read to establish coverage, it held that "perchlorate was a necessary ingredient in SFC's business, the manufacture of signal flares. Denying coverage on the basis that perchlorate is a pollutant would render the coverage for environmental liabilities illusory." *Id.* at 185. The *National Union* court's reasoning focuses on the definition of "pollutant" because National Union did not appear to suggest that any other clause in its contract could excuse coverage, not because the gasoline exclusion can only work if placed in some specific spot.

We thus conclude that the Pollution Exclusion in the Federated policy was sufficiently explicit to exclude gasoline contamination from coverage. Since the Pollution Exclusion successfully frees appellees from the obligation to defend the *Bowens* action based on the main CGL policy, we do not reach the question of whether the Continuous Injury Endorsement or Known Loss Exclusion provide parallel paths to the same conclusion. We must still consider, however, whether the district court erred in holding that neither the excess liability coverage nor the products-completed operations hazard coverage contained in the supplemental Federated Umbrella policy provide grounds for the relief that West Bend seeks.

With respect to the Excess Liability coverage, the plain language of the contract answers the question. The relevant part of Federated's Commercial Umbrella Liability Policy reads:

> A. EXCESS LIABILITY COVERAGES
>
> Except as excluded under the underlying insurance, we will pay on behalf of the insured those sums that the insured becomes legally obligated to pay as damages that are covered by underlying insurance:
>
>> a) because of bodily injury, personal injury, property damage or advertising injury as defined within the applicable underlying insurance; and
>>
>> b) which are in excess of the applicable underlying insurance limit.
>
> . . .

With respect to A. EXCESS LIABILITY COVERAGES all exclusions contained within the applicable under-lying insurance apply.

The Federated policy thus makes Excess Liability coverage coextensive with the primary CGL coverage. Since the CGL policy effectively excludes liability from gasoline leaks, the Excess Liability policy does the same.

Appellant next argues that even if the pollution exclusion in the CGL applied to gasoline, the Additional Liability Coverages in Federated's Umbrella policy provide an alternative ground for relief. The relevant provision insures damages from an "occurrence" during the policy period that arises from the "products-completed operations hazard," which in turn includes

[A]ll "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

a. products that are still in your physical possession; or

b. work that has not yet been completed or abandoned.

The Umbrella policy defines "your product" to mean

a. any goods or products, other than real property, manufactured, sold, handled, distributed or disposed by:

(1) you;

(2) others trading under your name; or

> (3) a person or organization whose business or assets you have acquired; and

> b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

Federated excludes injury or property damage caused by pollutants from Additional Liability Coverage, but defines "pollutants" differently than in the primary CGL policy. The Umbrella definition of "pollutants" describes the premises from which they may escape but then explains that "[p]ollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." While this definition is identical to the one in *Kiger* (both make no mention of gasoline or liquids comprising the primary product of the insured), it cannot lead to Federated's liability for the *Bowens* action here. The definition of "pollutants" here modifies only the products-completed operations hazard coverage, which, unlike a general commercial policy, does not insure damage from accidental release as a matter of law.

On the one occasion the Indiana Supreme Court has dealt with this subject, it interpreted a products-completed operations hazard clause to describe "claims arising from the placement of defective goods into the stream of commerce by the insured." *B & R Farm Serv., Inc. v. Farm Bureau Mut. Ins. Co.*, 483 N.E.2d 1076, 1077 (Ind. 1985). Appellees argue that this case controls the interpretation of the Federated Umbrella Policy and requires us to find that, as a matter of Indiana law, the products

hazard clause therein cannot reach accidental spills. That position is too strong. Unlike the present case, *B & R Farm Services* interpreted an exclusion to an insurance contract, not a grant of coverage. Since the purchaser of insurance generally cannot negotiate the precise wording of the policy, courts view these two types of provisions through distinct presumptive lenses. All things being equal and with deference to the text of the contract, we favor broad readings of coverage grants and narrow constructions of coverage exclusions. In this light, the Indiana Supreme Court's pronouncement of the meaning of products-hazard clauses appears less absolute than the appellees ask us to believe. *B & R Farm Services* certainly controls the scope of exclusions denying insurance to injuries arising out "completed products," but the case serves only as persuasive authority for the proper interpretation under Indiana law of clauses purporting to grant strictly that coverage necessary to insure injuries from those same "completed products."

The impact of *B&R Farm Services* on this case is further attenuated by the fact that the Farm Bureau Mutual policy underpinning that dispute was worded somewhat differently than the Federated Umbrella policy. The former, unlike the latter, contained an active verb, excluding coverage for products that have been "relinquished" to others.[1] The Indiana Supreme Court focused on this

---

[1] The clause stated, in relevant part, that the policy excluded "bodily injury and property damage arising out of the named

(continued...)

language to reach its holding ("We deem the act of relinquishment to be one which necessarily involves volition, not something which occurs accidentally or involuntarily," *id.*).

Despite these differences in posture, *B & R Farm Services* proves informative on the proper meaning of the Federated products-hazard clause. When the Indiana Supreme Court "deemed" the act of relinquishment to require volition, it relied on general distinctions between theories of liability, not on dictionaries. We apply this approach here to determine that, despite weak wording,[2]

---

[1] (...continued)

insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from the premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others."

[2] The definition of "Products-completed operations hazard" within the Umbrella policy does not define "abandoned" but explains that

"Your work" will be deemed completed at the earliest of the following times:

a. when all of the work called for in your contract has been completed;

b. when all of the work to be done at the site has been completed if your contract calls for work at more than one site; or

(continued...)

the Federated products-hazard clause covered only knowingly completed market transactions and abandoned product. *See also Ohio Cas. Ins. Co. v. Reed*, 2006 U.S. Dist. LEXIS 56625, at *22 n.3 (S.D. Ind. Aug. 11, 2006) ("Indiana courts likely would find that accidental chemical contamination does not fit within the scope of products hazard coverage."). There is no doubt that the *Bowens* action was predicated on accidental leak of gasoline from MDK's storage tanks and West Bend never contended that the gas station abandoned its product. Therefore, the Federated Umbrella policy does not provide an independent source of recovery for the appellants.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Federated.

---

[2] (...continued)

> c. when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

SYKES, *Circuit Judge,* dissenting.  I agree with my colleagues that the pollution exclusion in Federated's 2001-2003 CGL policy bars coverage under that policy. I do not agree, however, that the Indiana Supreme Court's decision in *B & R Farm Services, Inc. v. Farm Bureau Mutual Insurance Co.*, 483 N.E.2d 1076 (Ind. 1985), precludes coverage under Federated's 2001-2002 umbrella policy. That policy provides additional insurance for losses covered under "[t]he 'products-completed operations hazard' anywhere in the world." The policy defines the "products-completed operations hazard" as follows:

> **"Products-completed operations hazard"** includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>
> a. products that are still in your physical possession; or
>
> b. work that has not yet been completed or abandoned.

The loss at issue here arose out of a 1996 gasoline leak at the insured's gas station. Gasoline escaped from MDK's underground storage tank and migrated into a nearby residential neighborhood, contaminating the groundwater and causing property damage and bodily injury to the homeowners and their families. The homeowners sued MDK in September 2002 (the *Bowens* class action); West Bend accepted the tender of defense and eventually settled the case for $4 million. West Bend then sued Federated and several other MDK insurers seeking to recoup some or all of its defense and settlement costs via theories of subrogation, contribution, and estoppel. The district court entered summary judgment for the

defendant insurers. Only West Bend and Federated remain in the case on appeal.

The parties agree (and I do, too) that the loss underlying the *Bowens* action does not come within the "completed operations" aspect of the products-completed operations hazard in the umbrella policy; the limitations on coverage for "your work" are therefore not implicated here. If this coverage applies at all, it can only be by virtue of the "products hazard" language. Based on that language, I think the loss underlying the *Bowens* action falls comfortably within the policy's coverage.

The umbrella policy defines "your product" as follows:

**"Your product"** means:

a. any goods or products, other than real property, manufactured, sold, handled, distributed or disposed by:

(1) you;

(2) others trading under your name; or

(3) a person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

By this specific definition of "your product," read together with the pertinent part of the general definition of the products-completed operations hazard, the umbrella policy shifts the following risk from MDK to Federated: the risk of loss from (1) "bodily injury" or "property

damage"; (2) occurring "away from [the insured's] premises"; and (3) "arising out of 'your product,'" defined as "any goods or products . . . sold, handled, distributed or disposed by" the insured, provided that the product was not in the insured's possession at the time of the loss. These criteria for coverage under the "products hazard" are satisfied here. The loss at issue stemmed from "bodily injury" and "property damage" occurring away from MDK's gas station and arising out of MDK's "product"—that is, its gasoline—which was not in MDK's possession at the time of the loss. On the face of it, the claim should be covered.

My colleagues read the *B & R Farm Services* case to preclude coverage under the products-completed operations hazard. As they have acknowledged, however, there are a couple of reasons to distinguish that case. First, *B & R Farm Services* concerned an *exclusion* in a CGL policy, not (as here) a coverage-granting provision. This distinction is important in insurance law. Generally speaking, coverage-granting language in an insurance policy is construed from the standpoint of an average policyholder and read broadly in favor of coverage; any doubts or ambiguities about coverage are resolved against the insurer. Exclusions, on the other hand, are generally read more narrowly; ambiguities in an exclusion are construed strictly against the insurer. Indiana follows these interpretive rules. *See, e.g., Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009).

Second, and more importantly, the exclusion in *B & R Farm Services* contained limiting language not present

in the coverage-granting provision at issue here. The products-hazard provision in *B & R Farm Services* excluded bodily injury or property damage arising out of the insured's products but "only if the bodily injury or property damage occurs away from the [insured's] premises . . . *and after physical possession of such products has been relinquished to others*." 483 N.E.2d at 1077 (emphasis added). As my colleagues have explained, the decision in *B & R Farm Services* hinged specifically on the policy's use of the language I have italicized, which narrowed the scope of the products-hazard exclusion. The Indiana Supreme Court read this language to require a volitional "act of relinquishment" and held that the products-hazard exclusion applied only to "claims arising from the placement of defective goods into the stream of commerce." *Id.* The loss at issue in *B & R Farm Services* arose out of a fertilizer leak at the insured's manufacturing plant that contaminated a nearby creek. Because this loss did not arise out of the insured's placement of defective goods into the stream of commerce, the court held that the exclusion did not apply. *Id.* In other words, the state high court read the exclusion narrowly and held the claim *was covered.*

Unlike my colleagues, I think these differences combine to make *B & R Farm Services* inapplicable here. *B & R Farm Services* involved the interpretation of limiting language in a products-hazard *exclusion*; we are not required to interpret coverage-*granting* language in exactly the same way, especially where, as here, the products-hazard provision does not contain the same or similar limiting language. More significantly, I do not read *B & R Farm*

*Services* as a definitive statement of Indiana insurance law about the proper interpretation of products-hazard coverage in CGL policies as a general matter. The court's opinion was very brief and its holding was underreasoned. The court focused solely on the provision's requirement of product "relinquishment" and concluded without further analysis that the exclusion only applied to claims arising from the insured's placement of defective products into the stream of commerce. Because this conclusion came with so little explanation, I hesitate to extrapolate from *B & R Farm Services* a general rule of Indiana insurance law that a products-hazard provision in a CGL policy covers "only knowingly completed market transactions and abandoned product," as my colleagues have concluded.[1] Maj. op. at 18.

---

[1] In arriving at this interpretation, my colleagues have engrafted the limitations applicable to the "completed operations" hazard onto the "products" hazard. I think this is a mistake. A CGL policy is, as its name implies, a general-liability policy that insurers sell to a wide variety of commercial insureds. The products-completed operations hazard in a standard-form CGL policy provides coverage against two kinds of hazards: the "products" hazard and the "completed operations" hazard. Although they are lumped together in the standard form, they are in fact distinct types of coverage. (It would be easier to see the distinction if the punctuation were more precise: "products/completed operations hazard" is clearer.) *See generally* 20 ERIC MILLS HOLMES, HOLMES' APPLEMAN ON INSURANCE § 129.1 (2d ed. 2002) (discussing the products-completed operations hazard). These policies are written on the standard

(continued...)

---

[1] (...continued)

form but are sometimes—perhaps often—adapted to particular customers' needs and circumstances. In general, however, the "products hazard" part of the "products-completed operations hazard" covers manufacturers, distributors, and sellers of products; the "your product" definition in the policy modifies the "products hazard" coverage. The "completed operations" hazard typically covers construction contractors and the like, who routinely conduct their "operations" away from their primary premises; the "your work" limitations in the policy modify the "completed operations" hazard.

Importantly, the "completed or abandoned" limiting language in this coverage has nothing to do with the "products hazard." These limitations relate instead to the "completed operations" hazard, which as I have noted is typically for construction contractors whose business involves not "products" but "work." This distinction is clear from subsection (b) of the products-completed operations hazard provision, which excludes coverage for "*work* that has not yet been completed or abandoned." This same limitation is *not* included in the "products hazard" part of the products-completed operations hazard; the only limitation appearing there is for "products that are still in your physical possession." Thus, the "completed or abandoned" limitations in the products-completed operations hazard are relevant *only* to the scope of the "completed operations" hazard, which is not at issue here. This conclusion also flows from the policy's description of when "your work" will be deemed "completed" and therefore covered under the "completed operations" hazard. This language is all about work performed by contractors; it has no application to the "products hazard" part of the products-completed operations hazard. By

(continued...)

Much modern insurance-coverage litigation inter-
preting the products-completed operations hazard in the
standard-form CGL policy occurs in the context of
disputes over the policy's business-risk exclusions—more
specifically, the so-called "your product" and "your
work" exclusions, which typically exclude coverage for
damage to the insured's own "work" or "product" *arising
out of* the products-completed operations hazard. *See
generally* 20 ERIC MILLS HOLMES, HOLMES' APPLEMAN ON
INSURANCE § 129.1 (2d ed. 2002) (discussing the products-
completed operations hazard); 21 *id.* § 132.9[C], [D] (dis-
cussing the business-risk exclusions). Coverage claims
over these clauses proliferate, the interplay between the
exclusions and the covered hazard creates difficult inter-
pretive questions, and the caselaw in this area is not
always consistent. This is another reason not to read *B & R
Farm Services* for more than it's worth. I would not
extend the case beyond its specific context.[2]

---

[1] (...continued)
adopting a "completed market transaction and abandoned
product" interpretation of the "products hazard" coverage, my
colleagues have imported limitations that by their terms are
applicable only to a different part of this coverage—the "com-
pleted operations" hazard.

[2] In this regard, I note that my colleagues' interpretation of the
"products hazard" amounts to more than just an application
of *B & R Farm Services*—it is a fairly significant *extension* of the
case. The Indiana Supreme Court did *not* say there must be a
"completed market transaction" or "abandoned product" for

(continued...)

In short, because *B & R Farm Services* is distinguishable, I would not apply its "placement in the stream of commerce" gloss here. Based on the products-hazard policy language at issue in this case, the loss associated with the *Bowens* action is a covered loss. Federated has also raised the known-loss doctrine as a possible alternative barrier to coverage under the umbrella policy. This common-law doctrine bars coverage if the insured had "actual knowledge that a loss has occurred, is occurring, or is substantially certain to occur on or before the effective date of the policy." *Gen. Housewares Corp. v. Nat'l Surety Corp.*, 741 N.E.2d 408, 414 (Ind. Ct. App. 2000). The known-loss doctrine is premised on the fortuity principle that is inherent in all insurance, *id.* at 414-15, and the burden of proving that the loss was known "is on the

---

[2] (...continued)
this clause to apply. Instead, it said the exclusion before the court in that case—with its product "relinquishment" requirement—excluded only claims "arising from the placement of defective goods into the stream of commerce by the insured." *B & R Farm Services*, 483 N.E.2d at 1077. Nothing in this formulation requires either a "completed market transaction" or "abandoned product." I can think of situations in which a manufacturer, distributor, or seller of a product might be sued for damages arising out of bodily injury or property damage from its product where there is neither a "completed market transaction" nor "abandoned product." The "products hazard" coverage on its face would apply but for the additional limitations imported here from the "completed operations" hazard.

party seeking to avoid coverage," *id.* at 414. This "is ordinarily a question of fact." *Id.* at 413-14.

As I read the record in this case, there is conflicting evidence on the question whether MDK knew the loss at issue in the *Bowens* action had occurred, was occurring, or was substantially certain to occur before the umbrella policy's effective date. I would remand for resolution of that question. Accordingly, for all the foregoing reasons, I respectfully dissent.