CRAWFORDSVILLE SQUARE, LLC
and Crawfordsville Square II,
LLC, Appellants,

v.

MONROE GUARANTY INSURANCE
COMPANY, Allstate Insurance Com-
pany, Hoosier Insurance Company,
United States Fidelity & Guaranty In-
surance Company, Linneaus Wheeler,
Tamara Yount, Rick Bridwell, Thom-
as Shaver, the Estate of Mary L. Shav-
er, the Estate of J. Noel Shaver, and
the Estates of Ruth S. and William R.
Chaney, Appellees.

No. 54A01–0807–CV–327.

Court of Appeals of Indiana.

May 29, 2009.

Brent W. Huber, Brian J. Paul, Ice Miller LLP, Indianapolis, IN, Attorneys for Appellants.

Robert A. Smith, Lesley A. Kelsey, Smith & Wade, LLP, Carmel, IN, Attorneys for Appellee Monroe Guaranty Insurance Company.

## OPINION

BRADFORD, Judge.

Appellants Crawfordsville Square, LLC, and Crawfordsville Square II, LLC (collectively, "CS"), appeal from the trial court's denial of their motion for partial summary judgment against Appellee Monroe Guaranty Insurance Company and the trial court's grant of Monroe Guaranty's motion for partial summary judgment. At issue is whether Monroe Guaranty has a duty to defend CS in a series of administrative

actions and lawsuits arising out of the contamination of property owned by CS. We affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

CS is a limited-liability corporation that operates a shopping mall in Crawfordsville. CS learned in early 1998 that a parcel of land located at 201 and 203 South Street and adjacent to the mall ("the Parcel") was to be auctioned. The Parcel contained several businesses, including a dry cleaner and a car wash that sold gasoline. Ultimately, CS attended the auction and won the Parcel for $350,000, and CS and seller Ruth Chaney executed a purchase agreement on June 28, 1998.

Soon thereafter, as part of an environmental audit, CS had subsurface testing performed on the Parcel. On September 29, 1998, CS member L.E. Kleinmaier, Jr., sent a letter to Peggy Hedrick, an agent of Chaney's, which provided as follows:

Dear Peggy:

Thank you for discussing the updated environmental issue with me as a result of the second testing for dry cleaner contaminants. I am enclosing a copy of the latest report.[1]

Clean up [sic] of both petroleum and cleaning agent contamination must happen. The law requires it. We are willing to proceed with the closing provided an escrow account is established with the title company in the amount of $90,000. The title company will hold the funds and make disbursements from time to time to the environmental firm (AEAC) which will perform the clean-up. After two successive quarters of below action level reports, the Indiana Department of Environmental Management

will issue "no further action" letter is received from the state. [sic]

Please inform Mrs. Cheaney [sic] of our position.

Appellant's App. p. 1050.

CS ultimately agreed to proceed to closing on the Parcel so long as Chaney established an escrow account of $44,000, and closing occurred on February 5, 1999. The closing and escrow agreement provided, in part, that "[t]he parties have confirmed the existence of petroleum and other contamination of the soil and water on and under the Real Estate that is residual contamination from the operation of a cleaner and underground storage tanks on the Real Estate." Appellant's App. p. 1052.

Also on February 5, 1999, CS's insurance agency contacted Monroe Guaranty regarding the Parcel, seeking to add it to CS's existing general commercial liability insurance policy. Although CS's agency advised Monroe Guaranty that a dry cleaners was operating on the Parcel, neither CS's agency nor CS advised Monroe Guaranty of the existence or believed existence of dry cleaning contamination at the site.

On June 23, 2005, Astbury Environmental Engineering ("AEE") reported evidence of contamination on the Parcel to the Indiana Department of Environmental Management ("IDEM"). On June 27, 2005, IDEM sent notice of the contamination to CS, also requesting that it investigate the nature and extent of the contamination. On August 23, 2005, CS brought suit against former owners of the Parcel and their insurers seeking to "obtain funding to remediate soil and groundwater contamination" of the Parcel.

In late 2006 and early 2007, Monroe Guaranty denied to CS that it was obligated to defend it against the IDEM action

---

1. Interestingly, the "latest report" attached to the letter does not appear in the record.

and counterclaims that were eventually brought by prior owners of the Parcel and their insurers. On March 2, 2007, Monroe Guaranty brought suit for declaratory judgment on the issue of its duty to defend CS. On September 26, 2007, CS filed a motion for summary judgment. On December 4, 2007, Monroe Guaranty responded to CS's motion for summary judgment and filed a cross-motion for summary judgment. On June 25, 2008, the trial court denied CS's motion for summary judgment and granted Monroe Guaranty's.

## DISCUSSION AND DECISION

CS contends that the trial court erred in granting Monroe Guaranty's motion for summary judgment. When reviewing the grant or denial of a summary judgment motion, we apply the same standard as the trial court. *Merchs. Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.*, 741 N.E.2d 383, 386 (Ind.Ct.App.2000). Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Id.*; Ind. Trial Rule 56(C). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Id.* To prevail on a motion for summary judgment, a party must demonstrate that the undisputed material facts negate at least one element of the other party's claim. *Id.* Once the moving party has met this burden with a prima facie showing, the burden shifts to the nonmoving party to establish that a genuine issue does in fact exist. *Id.* The party appealing the summary judgment bears the burden of persuading us that the trial court erred. *Id.*

### The Known Loss Doctrine

CS contends that the "known loss" doctrine does not preclude coverage in this case and therefore does not excuse Monroe Guaranty from its obligation to defend CS. The known loss doctrine was first recognized by this court in *General Housewares Corp. v. National Surety Corp.*, 741 N.E.2d 408 (Ind.Ct.App.2000):

The "known loss" doctrine is a common law concept deriving from the fundamental requirement in insurance law that the loss be fortuitous. *Pittston Co., Ultramar America Ltd. v. Allianz Ins. Co.* (1997) 3d Cir., 124 F.3d 508, 516. Simply put, the known loss doctrine states that one may not obtain insurance for a loss that has already taken place. *Id.* Describing the known loss doctrine, commentators have noted that "losses which exist at the time of the insuring agreement, or which are so probable or imminent that there is insufficient 'risk' being transferred between the insured and insurer, are not proper subjects of insurance." 7 LEE R. RUSS AND THOMAS F. SEGALLA, COUCH ON INSURANCE, § 102:8 at 20 (3d ed.1997).

This principle has been referred to by various names, including "loss in progress," "known risk," and "known loss." RUSS AND SEGALLA, supra, § 102:8 at 20. "Loss in progress" refers to the notion that an insurer should not be liable for a loss which was in progress before the insurance took effect. *Id.* Although the term "known loss" has been limited to those situations where a loss has actually occurred, *see, e.g., Domtar, Inc. v. Niagara Fire Ins. Co.* (1997) Minn., 563 N.W.2d 724, most courts have defined the doctrine to also include losses which are "substantially certain" to occur or which were a "substantial probability." RUSS AND SEGALLA, supra, § 102:8 at 21. Despite some differences between the various labels used, we agree with the Illinois Supreme Court, which noted that the term " 'known loss' most adequately de-

scribes the doctrine." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.* (1992), 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1209–10. Therefore, we will use the term "known loss" to encompass the fortuity principle.

. . . .

[W]e hold that if an insured has actual knowledge that a loss has occurred, is occurring, or is substantially certain to occur on or before the effective date of the policy, the known loss doctrine will bar coverage. This is not to say, however, that parties may not explicitly agree to cover existing losses. Indeed, the known loss doctrine is inapplicable "if the insurer also knew of the circumstances on which it bases the defense." RUSS AND SEGALLA, supra, § 102:8 at 23.

*Id.* at 413–14.

### A. CS's Knowledge of the Loss

■ CS contends that the designated evidence creates a genuine issue of material fact regarding whether, when it added the Parcel to its policy with Monroe Guaranty, it was not actually aware that a loss had occurred, was occurring, or was substantially certain to occur. We disagree. On September 29, 1998, CS member Kleinmaier sent a letter to Hedrick indicating that "[c]lean up [sic] of both petroleum and cleaning agent contamination must happen. The law requires it. . . . After two successive quarters of below action level reports, the Indiana Department of Environmental Management will issue 'no further action' letter is received from the state. [sic.]" Appellant's App. p. 1050. Indeed, Kleinmaier's letter included a request that an escrow account in a specific amount be made available for the clean-up,

indicating that CS knew enough regarding the contamination to estimate the cost of its remediation. The communication clearly indicates knowledge of dry cleaning contamination [2] and, by its references to legally-mandated clean-up and IDEM requirements for successful compliance with applicable regulations, that the contamination was at actionable levels. This, however, is not the end of our inquiry.

Kleinmaier's letter, if a true reflection of CS's knowledge, clearly indicates knowledge of actionable levels of contamination, but there is other designated evidence that casts doubt on the sincerity of the assertions therein. When asked in an October 30, 2007, deposition about the letter and the surrounding negotiations, Kleinmaier responded as follows:

I knew that there was a dry cleaner on the site, and there was potential contamination, just as we learned that there was a gas station formerly operating on the—on the site with potential contamination. I wanted to make her aware—make her client aware that this was of concern to Crawfordsville Square, and we wanted to get the best deal we could in terms of funding.

Appellant's App. p. 1078. Kleinmaier's response indicates knowledge only of *potential* contamination at the time, which is inconsistent with the positive declarations contained in the letter. Although the two pieces of designated evidence are contradictory, we conclude that that is not enough, under the circumstances of this case, to create a *genuine* issue of material fact.

■ Essentially, what CS is attempting to do is show that a genuine issue of material fact exists because Kleinmaier's

---

2. Although CS does not specifically argue that these references apply only to petroleum contamination, which is not at issue in this litigation, we note that there is no indication anywhere in the record that they do not apply to dry cleaning contamination with equal force.

deposition testimony contradicts the assertions in his earlier letter to Hedrick. It has long been the law in Indiana and many other jurisdictions that "contradictory testimony contained in an affidavit of the nonmovant may not be used by him to defeat a summary judgment motion where the only issue of fact raised by the affidavit is the credibility of the affiant." *Gaboury v. Ireland Rd. Grace Brethren, Inc.*, 446 N.E.2d 1310, 1314 (Ind.1983) (citation omitted). In adopting this rule, the *Gaboury* Court noted that " '[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.' " *Id.* (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)).

■ Here, the factual posture is different than that of the typical "sham affidavit" case, in which an affidavit contradicts that party's prior sworn deposition testimony. Given the rationale for the rule and the facts before us, however, we conclude that it applies in this case as well. When an affidavit is impeached by prior sworn testimony without sufficient explanation, the court must view that affidavit with profound skepticism. *See, e.g., Herrera v. CTS Corp.*, 183 F.Supp.2d 921, 928 (S.D.Tex.2002). We see nothing in this record to indicate that we should view Kleinmaier's deposition with any less skepticism, especially when one considers that the letter to Hedrick preceded the current litigation by several years and the deposition was taken after commencement of the lawsuit.

■ Moreover, we see nothing in the record that would explain the discrepancy, other than the strong implication that CS may have deliberately misled Chaney regarding its knowledge of contamination on the parcel. This sort of explanation, however, will not suffice. "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995). There is no indication that any of Kleinmaier's statements, either in the letter or in the deposition, were the result of mistake or confusion. In this case, at least, we believe that application of the general rule is warranted, given that its overriding purpose is to prevent a party from generating its own genuine issue of material fact by providing self-serving contradictory statements without explanation. As such, we reject for appellate consideration that portion of Kleinmaier's deposition indicating that CS was aware only of the possibility of contamination on the parcel. We are left, then, with only Kleinmaier's letter, which clearly indicates knowledge of actionable contamination.

Moreover, we conclude the lack of evidence in the record of a formal IDEM action pending at the time of the sale does not help CS here. A reasonable inference to be drawn from references in the letter to the requirements of the law and to IDEM regulations establishes that, at the very least, CS was aware that the Parcel's contamination was at actionable levels and would require remediation, even if IDEM had not yet told CS that it was required to do so. Under such circumstances, the lack of formal action (even assuming such a lack existed) was essentially irrelevant in this case.

CS relies on two foreign cases to support its argument that it has not been

shown to have actual knowledge, both of which are easily distinguished. In *Missouri Pacific Railroad Co. v. American Home Assurance Co.,* the question was whether a letter from Missouri Pacific's general attorney to three other officers established a known loss, precluding insurance coverage for subsequent claims of industrial hearing loss. 286 Ill.App.3d 305, 221 Ill.Dec. 648, 675 N.E.2d 1378, 1380 (1997). The letter provided in relevant part, "From what I have been able to read and learn from discussion with other claim people, the industrial hearing loss is definitely going to be one of the big claim areas in the future." *Id.*

The Illinois Court of Appeals concluded that the letter did not establish as a matter of law a known loss on the part of Missouri Pacific. *Id.* at 1382. The court found that the letter demonstrated not a known loss but, rather, that hearing-loss-related claims *"would* become a problem if the trend of filing [such] claims continued." *Id.* (emphasis in *Missouri Pacific* ). The letter also suggests consultation with the safety department, operating department, and chief medical officer on the matter of hearing guards. *Id.* In the end, the court concluded that the record only indicated knowledge of a risk which did not rise to the level of knowledge of a probable loss. *Id.* at 1383.

This case, however, is a different story. Quite simply, here, unlike in *Missouri Pacific,* Kleinmaier's letter represents specific knowledge of a loss that had already occurred, not an attempt to warn management to take measures to prevent potential future losses, none of which had already occurred. *See id.* at 1383 ("Missouri Pacific attempted to negate any future claims

or possible losses by providing protection to its employees."). Kleinmaier's letter goes beyond mere knowledge of a potential future risk and demonstrates actual knowledge of a loss that had already occurred.

CS also relies on *United States Liability Insurance Co. v. Selman,* 70 F.3d 684 (1st Cir.1995). In *Selman,* the question was whether an insurer had the duty to indemnify the owner of an apartment building faced with a suit by a former resident based on lead poisoning allegedly caused by contamination in the building. *Id.* at 686. The insurer asserted the known loss doctrine, claiming that the owner had been aware of the presence of lead paint in the building and that the former resident had contracted lead poisoning prior to obtaining insurance. *Id.* at 690. The court affirmed the judgment of the district court that the insurer had failed to prove that the owner had insured against a known loss. *Id.* at 692. In so doing, the court held, *inter alia,* that "the applicability *vel non* of the known loss doctrine ... depends on the insured's actual knowledge of the looming loss." *Id.* at 691. While we have no quarrel with this portion of the holding, which is the portion on which CS relies, it nonetheless does not help CS. As previously mentioned, we conclude that the designated evidence establishes that CS had the required actual knowledge of dry cleaning fluid contamination at actionable levels, which constitutes a known loss. We conclude that CS has failed to establish a genuine issue of material fact regarding known loss.[3]

## B.  Monroe Guaranty's Knowledge of the Loss

CS also contends that, even if Monroe Guaranty establishes a known loss, the

---

**3.** A ruling in favor of CS on this point would essentially reward CS for what may well have been deceptive behavior on its part, and thereby serve as an unintended endorsement of the practice of exaggerating one's beliefs regarding possible or known contamination in order to negotiate a better price.

designated evidence also raises a question of fact regarding whether Monroe Guaranty knew of the loss as well. *See General Housewares*, 741 N.E.2d at 414 ("Indeed, the known loss doctrine is inapplicable 'if the insurer also knew of the circumstances on which it bases the defense.'"). We cannot agree. The relevant designated evidence relating to Monroe Guaranty's prior knowledge of the Parcel indicates only that it was aware that a dry cleaner was operating on the Parcel at the time of the closing. This mere knowledge does not, however, create a genuine issue of material fact regarding whether Monroe Guaranty had actual knowledge of actionable levels of dry cleaning-related contamination. Quite simply, there is nothing in the designated evidence to suggest that the mere presence of a dry cleaning business invariably leads to actionable contamination of the land on which it sits. Moreover, even if such contamination *is* inevitable, there is no evidence that Monroe Guaranty knew this. CS has not established that the designated evidence establishes a genuine issue of material fact regarding whether Monroe Guaranty knew of the actionable contamination at the Parcel.[4]

## CONCLUSION

We conclude that CS has failed to establish genuine issues of material fact regarding its known loss and whether Monroe Guaranty also knew of CS's loss. As such, the trial court correctly granted Monroe Guaranty's motion for summary judgment on the question of coverage, and we need not address CS's other arguments on appeal.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and MAY, J., concur.

4. To accept CS's argument on this point would be to burden insurers (at least in similar contexts) with essentially the same duty of due diligence as potential insureds to investigate and discover known losses. After all, almost any business could potentially contaminate the ground on which it sits. Of course, such a ruling would have the effect of relieving the potential insureds of any *practical* duty of due diligence, as the insurance company would be performing it in any event, or failing to do so at its peril. We are, to say the least, reluctant to endorse such a dramatic change in insurance business practice, *i.e.*, to shift the financial incentive entirely to insurers to discover latent defects in property their insureds propose to buy and insure, thereby removing the incentive to do so from the insured-the party typically better positioned to carry out this task.