

FILED
Apr 08 2015, 10:37 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEYS FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| George M. Plews | Ginny L. Peterson |
| Colin E. Conner | Kightlinger & Gray, LLP |
| Plews Shadley Racher & Braun, LLP | Indianapolis, Indiana |
| Indianapolis, Indiana | |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| 5200 Keystone Limited Realty, LLC, | April 8, 2015 |
| *Appellant-Plaintiff,* | Court of Appeals Cause No. |
| | 49A02-1410-PL-763 |
| v. | Appeal from the Marion Superior Court |
| | Cause No. 49D03-1309-PL-34315 |
| Netherlands Insurance Comp., Consolidated Insurance Comp., and Indiana Insurance Comp., | The Honorable Patrick L. McCarty, Judge |
| *Appellees-Defendants.* | |

**Barnes, Judge.**

## Case Summary

[1]     5200 Keystone Limited Realty, LLC ("KLR") appeals the trial court's grant of
summary judgment in favor of Netherlands Insurance Company

("Netherlands"), Consolidated Insurance Company ("Consolidated"), and Indiana Insurance Company ("Indiana") (collectively "the Insurers"). We affirm.

## Issue

KLR raises several issues on appeal. We need only address one issue: whether the common law "known loss" doctrine precludes KLR's action against the Insurers to compel them to provide a defense for KLR in an action brought by the Indiana Department of Environmental Management ("IDEM") to remove pollution from land owned by KLR.

## Facts

This suit concerns property located on Keystone Avenue in Indianapolis. In 2002, Apex Mortgage Company ("Apex") acquired the property for $240,000 in a foreclosure action against the last property owner, Eric Spicklemire. Spicklemire and his father had operated a film development business at the site, Filmcraft Laboratories, Inc. ("Filmcraft"), from 1974 to 2001. From 1956 to 1973, a former property owner had operated a dry cleaning facility at the site.

After the foreclosure, Apex hired a company, KERAMIDA Environmental ("KERAMIDA"), to evaluate the property for environmental contamination. In 2003, KERAMIDA prepared a report finding extensive soil and water contamination by a variety of chemicals, including chlorinated solvents and petroleum hydrocarbons. The report concluded:

> Based upon the results of the investigation, the site soils were found to be contaminated in several areas. Shallow soils were found to be contaminated in several areas. Shallow soils were found to be contaminated above regulatory action levels. . . .

> Groundwater samples confirmed contamination above the IDEM action levels from previous historical operations in a shallow perched zone. . . .

> . . . . Corrective Action on the Site is necessary due to the exceedances of contaminant concentrations being observed above the IDEM regulatory action levels. KERAMIDA recommends additional site investigation in order to determine the extent and to begin the development of a remediation work plan for the site.

App. p. 675.

[5] On October 9, 2003, Apex filed suit against Filmcraft to recover costs associated with environmental cleanup under Indiana's Environmental Legal Action ("ELA") statute, Indiana Code Section 13-30-9-2, and Indiana's illegal dumping statute, Indiana Code Section 13-30-3-13(d). The complaint alleged that Filmcraft was responsible for the environmental contamination on the site. It further stated,

> Apex incurred costs for testing and will incur significant costs for future testing to fully delineate the extent of the impact to the soil and groundwater at the Site, for subsequent remediation of the soil and groundwater at the Site, and to remove the discarded solid waste from the Site.

Id. at 1314-15. Apex sought a judgment requiring Filmcraft to reimburse Apex for all sums Apex incurred in remediating the site. Apex later amended its complaint to add as defendants a number of other prior owners of the property, including Spicklemire personally, and businesses who had used the property.

In December 2004, Demetrios Emmanoelides founded KLR and, acting on its behalf, signed an agreement to purchase the land from Apex for $20,000. The purchase agreement contained a number of provisions related to the environmental contamination at the site. The agreement stated in part:

> Seller has provided to Buyer, and Buyer acknowledges the receipt, review and understanding of, the following documents:
>
> A. a Phase II Environmental Site Investigation for the Real Estate, prepared by Keramida Environmental, Inc., and dated January 31, 2003;
>
> B. a Chemical Decommissioning report, prepared by Patriot Engineering and Environmental, Inc., dated July 23, 2004;
>
> C. a Complaint between Apex Mortgage Corporation, plaintiff, and Filmcraft Laboratories, Inc., defendant, involving the Real Estate, filed on October 9, 2003 (the "Lawsuit") . . . .

*Id.* at 650. The agreement further provided that KLR as buyer agreed to indemnify and defend Apex as seller "from and against any and all liability or claim arising from or related to the Real Estate, including without limitation any and all facts or conditions or concerns described in or arising from the foregoing documents or arising under or relating to any environmental law." *Id.* at 651. The agreement also assigned to KLR as buyer all of Apex's "right, title and interest in and to any claims or causes of action Seller has against third parties with respect to all such matters, including without limitation the Lawsuit referenced above." *Id.*

Simultaneously with purchase of the land, KLR obtained a commercial general liability policy through Netherlands. This policy was in effect from 2004 through 2005. Thereafter, KLR obtained coverage through Consolidated from

the end of 2005 through 2008.  KLR then obtained coverage through Indiana from the end of 2008 through June 2010.

[8]  KLR has continued to prosecute the lawsuit against Filmcraft and others that it acquired from Apex, and it is still not final.  On June 18, 2012, this court handed down an opinion in *Filmcraft Laboratories, Inc. v. 5200 Keystone Limited Realty, LLC*, No. 49A02-1107-CT-676 (Ind. Ct. App. June 18, 2012).  In that opinion, we addressed whether Filmcraft had guaranteed Apex (now KLR) payment of environmental and property tax liabilities incurred by Spicklemire personally.  We held that Filmcraft had guaranteed payment of tax liabilities but not environmental liabilities.[1]

[9]  Following handdown of this opinion, an IDEM employee read about the case on a blog.  Previously, no one from Apex or KLR had ever notified IDEM about contamination on the site.  On June 21, 2012, the IDEM employee wrote an email to counsel for KLR asking if the site was being addressed through any IDEM remediation program because she could find no record of it in IDEM's database.

[10]  On August 28, 2012, counsel for KLR responded by informing IDEM of the KERAMIDA study and the Filmcraft lawsuit.  On that same date, counsel for

---

[1] Subsequently, KLR continued prosecution of the lawsuit with respect to environmental claims. Eventually, KLR either obtained default judgments against or settled with all defendants, except for Spicklemire personally.  After a trial on KLR's ELA claims against Spicklemire, judgment was entered in Spicklemire's favor.  That judgment currently is on appeal before this court.

KLR sent a "Notice of Claim" to the Insurers. The notice stated that IDEM "has recently become aware" of contamination at the site and might require remediation in the future, and it requested that the Insurers "provide full indemnification and defense for this claim in accordance with the policy terms and Indiana law." *Id.* at 459. The Insurers did not respond to this notice, nor to one sent on November 5, 2012.

[11] On June 19, 2013, IDEM wrote a letter to KLR, Apex, Filmcraft, Spicklemire, and others, identifying KLR and the others as potentially responsible persons for remediation of the site. The letter required KLR and the others to take various steps to remediate the site unless it was later determined it was not a responsible person. After receipt of this letter, KLR filed a third "Notice of Claim" with the Insurers, informing them that IDEM was requiring KLR "to further investigate and remediate the contamination or face civil penalties." *Id.* at 471. The notice again sought "full defense and indemnification for this claim . . . ." *Id.*

[12] On July 31, 2013, the Insurers responded to this third notice with a letter declining either to defend KLR or indemnify it in relation to IDEM's remediation action. The Insurers gave a number of reasons why they believed they owed no obligations to KLR under their policies. Most prominently, the Insurers contended there was no coverage because KLR "was aware of the contamination at the Site prior to its purchase of the property, which was prior to the inception of the . . . policies." *Id.* at 314.

[13] On September 10, 2013, KLR filed a complaint against the Insurers, seeking to compel them to provide a defense in the IDEM action and to indemnify KLR for any costs it incurred in cleaning up the property in response to IDEM's action. KLR subsequently filed a motion for partial summary judgment against the Insurers with respect to their duty to defend KLR. The Insurers responded with a cross-motion for summary judgment in its entirety. In support of its summary judgment motion, KLR filed an affidavit from Emmanoelides stating in part, "KLR did not believe—and had no reason to believe—that it might ever be held responsible for contamination caused by former owners/operators." *Id.* at 545. The trial court granted the Insurers' motion for summary judgment. KLR now appeals.

## Analysis

[14] We review a granting of summary judgment de novo, reviewing the matter in the same way as the trial court. *Hughley v. State,* 15 N.E.3d 1000, 1003 (Ind. 2014). We will affirm only if, after drawing all reasonable inferences in favor of the non-moving party, the designated evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* A material fact is one the resolution of which would affect the outcome of a case, while an issue is "genuine" if a trier of fact must resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting inferences. *Id.*

[15] A summary judgment movant bears the initial burden of demonstrating the absence of a genuine issue of fact on a determinative issue. *Id.* If the movant does so, the non-movant then bears the burden of coming forward with contrary evidence showing an issue for the trier of fact. *Id.* We must carefully review a grant of summary judgment to ensure that a party was not improperly denied its day in court. *Id.*

[16] The trial court here entered a detailed written order explaining its decision. It is well-settled that special findings are not required in summary judgment proceedings and, even if they are entered, they are not binding on this court on appeal. *New Albany Historic Preserv. Comm'n v. Bradford Realty, Inc.*, 965 N.E.2d 79, 84 (Ind. Ct. App. 2012). We will affirm a grant of summary judgment upon any theory supported by the designated evidence, regardless of a trial court's stated theory. *Henderson v. Reid Hosp. & Healthcare Servs.*, 17 N.E.3d 311, 315 (Ind. Ct. App. 2014).

[17] On appeal, KLR focuses primarily upon an insurance company's duty to defend its insured, noting that the duty to defend is broader than the duty to indemnify. *See Liberty Mut. Ins. Co. v. OSI Indus., Inc.*, 831 N.E.2d 192, 200 (Ind. Ct. App. 2005), *trans. denied*. An insurer's duty to defend is examined based upon the allegations contained within the complaint against the insured, as well as upon those facts known or ascertainable by the insurer after reasonable investigation. *Newnam Mfg., Inc. v. Transcon. Ins. Co.*, 871 N.E.2d 396, 401 (Ind. Ct. App. 2007), *trans. denied*. "If the pleadings reveal that a claim is clearly excluded under the policy, then no defense is required." *Id.*

[18] Additionally, an insurer may go beyond the face of the complaint and refuse to defend based upon the factual underpinnings of the claims contained within the complaint. *Jim Barna Log Sys. Midwest, Inc. v. Gen. Cas. Ins. Co. of Wisconsin*, 791 N.E.2d 816, 823 (Ind. Ct. App. 2003), *trans. denied*. If an insurer is aware of facts outside the pleadings that clearly disclose an absence of coverage, it can refuse to defend.[2] *Id.* It is the nature of the claim, not its merits, that determines an insurer's duty to defend. *Id.*

[19] Indiana has adopted the common law "known loss" doctrine as applicable to all third-party liability insurance policies. *See General Housewares Corp. v. National Sur. Corp.*, 741 N.E.2d 408, 413 (Ind. Ct. App. 2000). This doctrine, which is not dependent upon particular policy language, derives "from the fundamental concept in insurance law that the loss be fortuitous." *Id.* at 413, 415. "Simply put, the known loss doctrine states that one may not obtain insurance for a loss that has already taken place." *Id.* at 413. A loss that exists at the time insurance is purchased, or one which is "'probable or imminent,'" is not a proper subject of insurance. *Id.* (quoting 7 Couch on Insurance, § 102:8 at 20 (3d. ed. 1997)). We further explained in *General Housewares*:

---

[2] Ordinarily, if an insurer has made an independent determination that it has no duty to defend, it must protect its interest by either filing a declaratory judgment action for a judicial determination of its obligations or hiring independent counsel to defend its insured under a reservation of rights. *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 42 n.6 (Ind. 2002). Here, KLR's complaint obviated the need for the Insurers to file their own declaratory judgment action.

The term "probability" indicates the presence of contingency and fortuity, the lack of which is the very essence of the known loss doctrine. Even if there is a probability of loss, there is some insurable risk, and the known loss doctrine should not apply. "Certainty," on the other hand, refers not to the likelihood of an occurrence, but rather to the inevitability of an occurrence. Therefore, a "substantially certain" loss is one that is not only likely to occur, but is virtually inevitable. The inquiry should be more of temporality than probability-when an event will occur, not whether an event will occur. We also note that, because the effect of the known loss doctrine is to avoid coverage, the burden of proving that the loss was known is on the party seeking to avoid coverage. Therefore, we hold that if an insured has actual knowledge that a loss has occurred, is occurring, or is substantially certain to occur on or before the effective date of the policy, the known loss doctrine will bar coverage. This is not to say, however, that parties may not explicitly agree to cover existing losses. Indeed, the known loss doctrine is inapplicable "if the insurer also knew of the circumstances on which it bases the defense."

*Id.* at 414 (citations and footnotes omitted).

[20] In *Crawfordsville Square, LLC v. Monroe Guar. Ins. Co.*, 906 N.E.2d 934 (Ind. Ct. App. 2009), *trans. denied*, we applied the known loss doctrine in a scenario very similar to the present one. In that case, after executing a purchase agreement but before closing, the property buyer had the land tested and it revealed extensive environmental contamination. The buyer then wrote a letter to an agent of the seller that stated in part, "Clean up [sic] of both petroleum and cleaning agent contamination must happen. The law requires it. . . . After two successive quarters of below action level reports, the Indiana Department of Environmental Management will issue 'no further action' letter is received from the state. [sic]" *Crawfordsville Square*, 906 N.E.2d at 936. Because of the environmental contamination, the buyer asked the seller to deposit money in an

escrow account to be used for remediation, and the seller agreed to do so. Before closing, the buyer obtained insurance without informing the insurer of the contamination. Over six years after closing, IDEM learned of the contamination and demanded action by the buyer to remediate the property. The buyer sought to require the insurer to provide a defense to IDEM's action, and it refused to do so. The insurer then initiated a declaratory judgment action to establish its lack of duty to defend, and the trial court granted the insurer's motion for summary judgment, despite submission of an affidavit from the buyer suggesting he only knew of potential contamination on the land, not that it definitely existed.

[21] On appeal, we affirmed summary judgment for the insurer on the basis of the known loss doctrine. We noted that the letter the buyer sent to the seller demonstrated clear knowledge of contamination at the site "and, by its references to legally-mandated clean-up and IDEM requirements for successful compliance with applicable regulations, that the contamination was at actionable levels." *Id.* at 938. We went on to hold:

> Moreover, we conclude the lack of evidence in the record of a formal IDEM action pending at the time of the sale does not help [the buyer] here. A reasonable inference to be drawn from references in the letter to the requirements of the law and to IDEM regulations establishes that, at the very least, [the buyer] was aware that the Parcel's contamination was at actionable levels and would require remediation, even if IDEM had not yet told [the buyer] that it was required to do so. Under such circumstances, the lack of formal action (even assuming such a lack existed) was essentially irrelevant in this case.

*Id.* at 939.

[22] Despite KLR's claim to the contrary, we find *Crawfordsville Square* to be virtually indistinguishable from this case in all pertinent respects. Before KLR purchased the property, KERAMIDA's report revealed the existence of soil contamination "above regulatory action levels" and groundwater contamination "above the IDEM action levels . . . ." App. p. 675. The report also stated, "Corrective Action on the Site is necessary due to the exceedances of contaminant concentrations being observed above the IDEM regulatory action levels." *Id.* Additionally, as a result of these revelations, Apex had filed suit against Filmcraft to recover costs for further testing and remediation; Apex further alleged that it had "incurred" and "will incur significant costs" as a result of the contamination. *Id.* at 1314-15. Upon purchasing the property, KLR was provided the KERAMIDA report and was substituted as plaintiff in Apex's lawsuit against Filmcraft. There is no evidence any of the Insurers ever were aware of any environmental contamination on the property when they agreed to issue policies to KLR.[3]

[23] Thus, just as in *Crawfordsville Square*, KLR as a purchaser of environmentally contaminated property was made aware of the existence of the contamination at levels above IDEM regulatory levels and that remediation definitely would

---

[3] In the original insurance application, KLR was asked, "Do/have past, present or discontinued operations involve(d) storing, treating, discharging, applying, disposing, or transporting of hazardous material? (e.g. landfills, wastes, fuel tanks, etc.)." App. p. 637. KLR responded no. In their summary judgment motion, the Insurers argued in part that this answer constituted a material misrepresentation in the insurance application that voided coverage. The trial court did not address this argument, and the Insurers have not raised it on appeal.

be required. KLR, through adoption of Apex's lawsuit, had taken steps to protect its financially against the costs of testing and remediation, just as the buyer in *Crawfordsville Square* had done by demanding an escrow payment by the seller to cover such costs. And, as we held in *Crawfordsville Square*, the lack of an existing IDEM enforcement action at the time KLR bought the property and obtained insurance is "essentially irrelevant . . . ." *Crawfordsville Square*, 906 N.E.2d at 939. This evidence conclusively demonstrates as a matter of law the existence of a known loss by KLR prior to the time it obtained insurance from the Insurers.

[24] As mentioned by KLR, it designated an affidavit from Emmanoelides stating in part, "KLR did not believe—and had no reason to believe—that it might ever be held responsible for contamination caused by former owners/operators." *Id.* at 545. This is an entirely self-serving affidavit; if accepted at face value, it would tend to negate application of the known loss doctrine. We recognize that, in *Hughley*, our supreme court recently addressed the use of self-serving affidavits in response to a summary judgment motion. In that case, the State sought civil forfeiture of the defendant's money and vehicle after he was convicted of dealing in cocaine. In response, the defendant filed a perfunctory and self-serving affidavit stating that the money seized by police during his arrest was not related to any criminal activities, nor was his car used in any criminal activities. Although our supreme court found this uncorroborated affidavit "thin" and the defendant's credibility likely to be dubious, it held the

affidavit was sufficient to defeat the State's summary judgment motion. *Hughley*, 15 N.E.3d at 1005.

[25] We observe that *Hughley* did not purport to overrule a line of cases beginning with *Gaboury v. Ireland Rd. Grace Brethren, Inc.*, 446 N.E.2d 1310 (Ind. 1983). In *Gaboury*, a plaintiff submitted an affidavit in response to the defendant's summary judgment motion that directly contradicted statements the plaintiff had made in a previous deposition. Our supreme court held that the affidavit did not create a genuine issue of material fact and concluded that a party cannot create such an issue simply by submitting an affidavit contradicting his or her own prior testimony. *Gaboury*, 446 N.E.2d at 1314. This proposition has since been cited in at least forty-four Indiana cases. *See, e.g.*, *Brown v. Buchmeier*, 994 N.E.2d 291, 296 (Ind. Ct. App. 2013).

[26] In fact, in *Crawfordsville Square* we applied *Gaboury* outside the context of a conflict between and affidavit and a prior deposition. We held that the property buyer could not create a material issue of fact by designating an affidavit disclaiming definite knowledge of environmental contamination on the land that conflicted with the earlier letter he had written informing the seller of the contamination and the need for remediation. *Crawfordsville Square*, 906 N.E.2d at 939. Here, there is even more reason to disregard Emmanoelides's affidavit claiming that KLR lacked knowledge that it could be responsible for remediation of the property. Not only did KLR have conclusive proof via the KERAMIDA report that the land was contaminated above IDEM regulatory levels, it accepted assignment of Apex's lawsuit against Filmcraft asserting that

Apex—and then KLR—had incurred and would continue to incur "significant costs" related to the contamination. App. at pp. 1314-15. KLR has actively prosecuted that lawsuit for over a decade and continues to do so. It would be illogical to allow KLR to be substituted as plaintiff in such a lawsuit and to continue to pursue it, seeking recovery from third parties of past and future costs related to the environmental contamination, while simultaneously pronouncing that it had no idea it could be responsible for such costs. KLR cannot have it both ways. Emmanoelides's affidavit is insufficient to create a genuine issue of material fact regarding application of the known loss doctrine. As such, there is no genuine issue of material fact regarding the doctrine, and the Insurers owe no coverage to KLR.[4]

## Conclusion

Any claim by KLR against the Insurers related to the IDEM remediation action is conclusively barred by the known loss doctrine. The trial court properly granted summary judgment in favor of the Insurers, and they are not required either to defend or indemnify KLR. We affirm.

Affirmed.

May, J., and Pyle, J., concur.

---

[4] Given our resolution of this issue, we need not address alternative arguments regarding whether summary judgment should have been granted. Also, our affirmance of the grant of summary judgment negates KLR's claim that it is entitled to attorney fees for having to bring suit against the Insurers in response to their denial of coverage.