

FILED

Jul 25 2019, 8:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jeffrey J. Stesiak
Jerome W. McKeever
James P. Barth
Pfeifer, Morgan & Stesiak
South Bend, Indiana

ATTORNEYS FOR APPELLEE
PROMPT MEDICAL
TRANSPORTATION, INC.

Sharon L. Stanzione
Alan M. Kus
Johnson & Bell, P.C.
Crown Point, Indiana

ATTORNEY FOR APPELLEE
ST. JOSEPH REGIONAL MEDICAL
CENTER

Robert J. Palmer
May Oberfell Lorber
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE
HUMANA INSURANCE COMPANY

Kirstin B. Ives
Falkenberg Ives LLP
Chicago, Illinois

Michael P. Misch
Anderson Agostino &
Keller, P.C.
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Steve Snyder, as Personal
Representative of the Estate of
Kimberly Snyder, Deceased,

*Appellant-Plaintiff,*

v.

Prompt Medical Transportation,
Inc.; Humana Insurance
Company; and St. Joseph
Regional Medical Center,

*Appellees-Defendants*

July 25, 2019

Court of Appeals Case No.
18A-CT-3112

Appeal from the St. Joseph County
Superior Court

The Honorable Jenny Pitts Manier,
Judge

Trial Court Cause No.
71D05-1311-CT-303

**Baker, Judge.**

[1] In 2013, Kimberly Snyder, a critically ill patient in need of a lung transplant, was transported by ambulance from Indiana to Pennsylvania. Along the way, the ambulance crew got lost, and the lengthened trip caused the crew to run out of Kimberly's sedation medication. She ultimately contracted pneumonia and died a week later.

[2] Her husband, Steve Snyder, as personal representative of her estate (the Estate), filed a lawsuit against St. Joseph Regional Medical Center (SJRMC), Prompt Medical Transportation, Inc. (Prompt), and Humana Insurance Company (Humana), alleging that their respective negligence resulted in Kimberly's wrongful death. A medical review panel unanimously found that Kimberly's death was not caused by the actions of SJRMC and Prompt.

[3]     The trial court dismissed the Estate's claims against Humana and granted summary judgment in favor of Prompt and SJRMC. We affirm, finding as follows: (1) the trial court did not err by striking the affidavits of the Estate's untimely disclosed expert witnesses; (2) there is no genuine issue of material fact with respect to the element of causation; and (3) the Estate's claims against Humana are preempted by federal law governing Medicare Part C.

# Facts

### *Underlying Incident*

[4]     On January 22, 2013, Kimberly was a cystic fibrosis patient at SJRMC; she needed a lung transplant and SJRMC determined that she should be transferred to a Pittsburgh hospital for the transplant. Kimberly was insured under a Medicare Advantage plan issued by Humana, which denied coverage for air transportation to Pittsburgh. Therefore, SJRMC arranged for Prompt to transport her by ambulance to the University of Pittsburgh Medical Center (UPMC) for the transplant.

[5]     On January 23, 2013, Prompt employees arrived at SJRMC to pick up Kimberly, who had been sedated, intubated, and put on a ventilator in preparation for the trip. Throughout the journey, Prompt continued Kimberly's sedation, regularly checked her vital signs, and monitored the performance of her ventilator.

[6]     Upon arrival to the Pittsburgh area, Prompt's employees got lost because there was no hospital at the address they had been given. They called UPMC for

directions but the hospital staff was unable to give directions from the ambulance's location. The crew then called 911 for directions to UPMC; the 911 operator was able to provide directions and they got back on track. Traffic was very slow due to rush hour. When the ambulance finally arrived at what the crew believed was the correct hospital, they learned that, in fact, they were at the wrong Pittsburgh hospital. What should have been a 334-mile trip had turned into a 370- to 395-mile trip.

During the lengthy ambulance transport, Kimberly's condition had worsened significantly. She was not receiving enough oxygen and began gagging on her breathing tube; there is some evidence that they ran out of her sedation medication. When Prompt arrived at the wrong hospital, a physician on site evaluated Kimberly and decided to admit her to the intensive care unit (ICU) at that location. The ICU physician discovered a clot clogging Kimberly's breathing tube and removed the clot; Kimberly then returned to stable condition. The ICU staff told Prompt that they would arrange for Kimberly's transfer to UPMC. Kimberly eventually contracted pneumonia and died one week later, on January 30, 2013.

### *The Litigation*

On November 26, 2013, the Estate filed a complaint for wrongful death against Prompt. In its response, Prompt named SJRMC and Humana as nonparties who may have contributed to the Estate's damages. On May 12, 2014, the Estate filed an amended complaint adding SJRMC and Humana as defendants. The trial court stayed the litigation while a medical review panel considered the

Estate's claims against Prompt and SJRMC.[1] On September 14, 2016, the medical review panel unanimously found that SJRMC complied with the applicable standard of care and was not a factor in the resultant damages. With respect to Prompt, one panel member opined that Prompt breached the standard of care, but the panel concluded unanimously that Prompt was not a factor in the resultant damages.

[9] On October 3, 2016, the trial court granted the Estate's request to reinstate the court case. In October and November 2016, respectively, Prompt and SJRMC filed motions for summary judgment. As part of its responses to these motions, the Estate attached the affidavit of Dr. Joseph Pilewski, who was one of Kimberly's treating physicians in Pittsburgh, to rebut the opinion of the medical review panel. In December 2016, Humana filed a motion to dismiss, arguing that the Estate's state law claim was preempted by the Medicare Advantage preemption provision and that Humana was entitled to official immunity.

[10] On May 4, 2017, the trial court summarily granted Humana's motion to dismiss and summarily denied the motions for summary judgment. The Estate, Prompt, and SJRMC sought to have the order certified for interlocutory appeal, but this Court denied those requests.

---

[1] Humana did not participate in the medical review panel process because it was not a qualified healthcare provider pursuant to the Indiana Medical Malpractice Act. I.C. § 34-18-1-1 *et seq.*

[11] The parties began preparing for a trial. On September 26, 2017, the trial court entered a pretrial order that included a number of case management deadlines but did not include any expert disclosure deadlines. On February 7, 2018, Prompt filed a motion asking that expert disclosure deadlines be put in place. The next day, the trial court entered an order setting the Estate's expert disclosure deadline for April 12, 2018, and the defendants' expert disclosure deadline for June 12, 2018. On April 12, 2018, the Estate disclosed Dr. Pilewski as its only trial expert.

[12] In the meantime, SJRMC and Prompt had filed a joint motion to continue the trial; the Estate opposed the request. After hearing argument, on May 3, 2018, the trial court vacated the trial date, vacated the September 2017 pretrial order, and reset the trial for April 2019. The order made no mention of the expert disclosure deadlines. SJRMC and Prompt disclosed their respective trial experts by the June 12 deadline.

[13] In August 2018, Prompt and SJRMC both filed renewed motions for summary judgment.[2] The Estate opposed both motions. In its response briefs, the Estate included affidavits of experts that had not previously been disclosed to Prompt and SJRMC. Prompt moved to strike those affidavits. On November 15, 2018, the trial court granted the motion to strike, noting that "[n]o request from relief

---

[2] Prompt acknowledged that, given the opinion of one of the medical review panel members that it had breached the standard of care, the issue of breach was not ripe for resolution by summary judgment. Instead, the basis of its argument on summary judgment was the unanimity of the medical review panel's conclusion that its conduct—whether a breach or not—did not cause Kimberly's death.

from the Court's February 8, 2018 Order was filed by any party. That Order remains in effect." Appellant's App. Vol. II p. 20. Therefore, Dr. Pilewski's affidavit was the Estate's only remaining expert evidence in opposition to summary judgment.

[14] The Estate filed a motion to reconsider the order granting the motion to strike the affidavits. The trial court denied, reasoning as follows:

> The Court's September 26, 2017 Pre-Trial Entry Order did not contain deadlines for the disclosure of experts. . . . [That order is] this Court's standard scheduling order. This Court has used this template for over twenty (20) years and "borrowed" it wholesale from the judge previously occupying this office who, herself, used that template for years. Plaintiff's counsel is familiar with the template. Among its features is that . . . it does not set expert disclosure deadlines. The Court will set expert disclosure deadlines if asked. . . . By entering its separate order of February 8, 2018, the Court established the manner in which expert disclosures—and any request to [modify] expert disclosure deadlines—would be addressed by the Court: by way of separate order.
>
> Moreover, the April 18, 2018 [fn 2] hearing on Defendants' Joint Motion to Continue makes clear that Plaintiff had one expert (whom Defendant's counsel referred to at least twice at that hearing as "Plaintiff's one expert"), without any suggestion from Plaintiff that he intended to retain additional experts. . . . Plaintiff argued repeatedly about the need to get the matter tried, noting that the case had been pending for a number of years. One would *not* have concluded, listening to the arguments at that hearing, that Plaintiff sought what would likely be further delay of a trial by the addition of more experts.

[fn 2] It is noted that as of the date of this hearing, Plaintiff's expert disclosure deadline had passed and the Court had not entered its May 3, 2018 Order which . . . Plaintiff argues vacated the expert disclosure deadline. Thus, as of the April 18, 2018 hearing, Plaintiff had no reason to believe he would be in a position to name additional experts and made no request of the Court that he be granted leave to do so.

\*\*\*

. . . If Plaintiff sought . . . to bolster Dr. Pilewski's testimony, and if Plaintiff believed the Court's orders provided him yet with the time to disclose experts, one would have expected Plaintiff to disclose those experts in the manner that is typically done, not by first designating their affidavits in his Opposition to the Renewed [Summary Judgment] Motion[s].

Appellant's App. Vol. II p. 24-26 (emphasis original).

[15] After briefing and argument was complete, on December 6, 2018, the trial court granted summary judgment in favor of SJRMC and Prompt. In pertinent part, as to Prompt, the trial court found that Dr. Pilewski's deposition testimony was inadmissible with respect to the issue of causation because it was speculative and unreliable. It also found that the deposition testimony negated the existence of the necessary foundation to support the opinions offered in his affidavit, rendering that evidence also inadmissible. The trial court focused on the following exchanges:

*Exchange 1*

***

Dr. Pilewski testified to a period of instability experienced by Kimberly [] as a result of the sedative, the Versed, wearing off. . . . Counsel, bringing Dr. Pilewski back to the question of whether any period of instability on the ventilator had "any effect or cause that led to her death," draws the following response from Dr. Pilewski: "Can I say that period of instability made her pneumonia worse? No. I can speculate that it may have, but I cannot say that there is a clear-cut causal relationship."

*Exchange 2*

. . . Dr. Pilewski was asked whether [the fact that Prompt transported Kimberly to the wrong hospital] was a breach of a standard of care, an issue not at issue in Prompt's [summary judgment motion]. In responding, Dr. Pilewski presumes Prompt's attorney's follow-up question about causation and proffers an opinion: "And your next question is probably going to be would the outcome have been any different if she was delivered directly to [the correct Pittsburgh hospital]? And the answer is, I don't know. My guess is that the same thing would have happened." He speculates as to what might have happened if her Versed did not run out ("maybe things turn out differently" and additional testimony about what "may" have been the outcome). When asked[] pointedly whether the likelihood of a different, better outcome had Kimberly Snyder been delivered to the [correct Pittsburgh hospital] without the delay experienced, he responds: "That's speculation."

*Exchange 3*

> Finally, Prompt designates testimony of Dr. Pilewski that denies Prompt caused the death of Kimberly [] and testimony that he could only speculate that any conduct on the part of Prompt "led to a decreased change of survival" for Kimberly [].

*Id.* at 30-31 (internal footnote omitted). In the end, the trial court found that Prompt showed the absence of any genuine issue of material fact as to whether Prompt's conduct caused Kimberly's death or was a substantial factor in her loss of a chance of survival. Given that it found Dr. Pilewski's testimony related to causation inadmissible, the trial court concluded that the Estate did not present evidence sufficient to show a question of fact or competing inferences regarding causation.

[16] With respect to SJRMC, the trial court focused on the standard of care, noting that the medical review panel unanimously concluded that SJRMC did not breach that standard. With respect to SJRMC's involvement with the decision to transport Kimberly to Pittsburgh by ambulance, Dr. Pilewski was questioned about the standard of care in Indiana; he responded that he was unfamiliar with the standard outside of Pennsylvania. He explicitly stated, "'I'm not a critical care transport expert. I don't live in the emergency medicine transfer world. I would just know that when I get phone calls about patients like [Kimberly], I do not endorse them coming by ground.'" *Id.* at 36. He admitted that he would be unable to identify anything done by SJRMC that was a breach of the standard of care. The trial court concluded that Dr. Pilewski's testimony "is an example of an expert declining to offer an opinion, an explanation of why he cannot offer an opinion, and an assertion that he knows his own experience but will

not impose it as a standard on other locales, facilities or providers." *Id.* at 37. It also notes that even if Dr. Pilewski's testimony were credited, there is no evidence in the record showing "what [SJRMC] did or did not do in connection with the decision that Kimberly [] be transported by ground ambulance to support the opinion in his affidavit that it breached the standard of care." *Id.*

[17] Additionally, with respect to causation and SJRMC, the trial court notes that "Dr. Pilewski expressly testified in his deposition . . . that Kimberly [] 'didn't die from anything that [SJRMC] did or didn't do' and that '[SJRMC] didn't do anything to decrease her chance of survival either.'" *Id.* at 38. Therefore, the trial court concluded that summary judgment should be entered in SJRMC's favor given that there was no genuine issue of material fact related to either breach of standard of care or causation. The Estate now appeals.

# Discussion and Decision

# I. Summary Judgment

[18] Our standard of review on summary judgment is well established:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the

undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

# A. Striking of Expert Affidavits

First, the Estate argues that the trial court erred by striking two of its expert affidavits offered as evidence in opposition to summary judgment. The trial court has the authority to enforce its pretrial orders and the parties have the right to insist upon the strict enforcement of those orders. *Nichols v. Ind. State Highway Dep't*, 491 N.E.2d 227, 229 (Ind. Ct. App. 1986). A party's failure to adhere to pretrial deadlines "is inexcusable and subject to sanction." *Davidson v. Perron*, 756 N.E.2d 1007, 1013 (Ind. Ct. App. 2001). We will reverse only upon a showing of clear error and resulting prejudice. *Cliver v. State*, 666 N.E.2d 59, 64 (Ind. 1996).

Here, the relevant timeline is as follows:

- On September 26, 2017, the trial court entered a pretrial order that included a number of case management deadlines but did not include any expert disclosure deadlines.
- On February 7, 2018, Prompt filed a motion asking that expert disclosure deadlines be put in place.
- The next day, the trial court entered an order setting the Estate's expert disclosure deadline for April 12, 2018, and the defendants' expert disclosure deadline for June 12, 2018.
- On April 12, 2018, the Estate disclosed Dr. Pilewski as its only trial expert. SJRMC and Prompt disclosed their respective trial experts by the June 12 deadline.

- After hearing argument on the defendants' motion to continue the trial, on May 3, 2018, the trial court vacated the trial date, vacated the September 2017 pretrial order, and reset the trial for April 2019. The order made no mention of the expert disclosure deadlines.
- On September 12, 2018, the Estate filed its response briefs to the defendants' pending summary judgment motions. In support of its opposition to summary judgment, the Estate designated affidavits of experts who had not previously been disclosed.

The Estate argues that when the trial court vacated the September 2017 pretrial order, it vacated the order "as amended," meaning that it also vacated the expert disclosure deadlines.

[21] We do not find the Estate's argument persuasive, given that the February 2018 order was a stand-alone, specific, valid order, to which the trial court never referred, either explicitly or implicitly, when it vacated the pretrial order. Moreover, all parties behaved as though the February 2018 order were still in effect—for example, the defendants disclosed their respective witnesses by June 12, 2018, in accordance with the February 2018 order. Moreover, during the ensuing months of litigation and argument, the Estate never once indicated that it intended to call more experts or seek relief from or clarification of the expert disclosure deadline. Indeed, in opposing the defendants' request to continue the trial, the Estate argued strenuously that the matter needed to get tried quickly because it had been pending for years, never hinting that it intended to slow down the process by disclosing more experts at that late date. Under these

circumstances, we find that the trial court did not err by striking the affidavits because the disclosure of those experts was untimely.[3]

[22] The Estate argues that even if its expert disclosures were untimely, the sanction of striking the affidavits is too harsh because it resulted in summary judgment being entered against it. We disagree. The affidavits were filed, and the experts disclosed, five months after the expert disclosure deadline had passed, and the Estate had never sought relief from that deadline. As such, the affidavits were subject to sanction, including being struck, and such a sanction was within the trial court's broad discretion.

[23] The Estate directs our attention to five factors set forth by this Court in *Davidson v. Perron*, to be considered by the trial court when a party seeks to use the testimony of an untimely disclosed witness. 756 N.E.2d 1007, 1013-14 (Ind. Ct. App. 2001).

- *When did the first witness become known to the opposing counsel?* Here, the expert witnesses were wholly unknown to counsel for Prompt and SJRMC until the Estate filed its responses to their motions for summary judgment, which was five months after the expert disclosure deadline had passed.
- *How vital is the potential witnesses' testimony to the case of the proponent of the witness—is it relevant and material or merely cumulative?* Here, the Estate itself indicated to the trial court that it believed that the testimony of Dr. Pilewski was sufficient to defeat summary judgment but that, out of "an

---

[3] We also note that the Estate's expert disclosure deadline had already come and gone by the time the trial court entered its order in May 2018; that window had already closed. There would be no need to reset dates for a deadline that had already expired.

abundance of caution," it also sought to designate two other experts. Appellant's App. Vol. V p. 81. In other words, the evidence was merely cumulative.

- *What is the nature of the prejudice to the opponent—would permitting the witnesses to testify have a deleterious impact on the case prepared by the opponent?* Prompt and SJRMC would be significantly prejudiced if these affidavits were not struck. They were unaware of the existence of the experts and had no opportunity to depose them, depose Dr. Pilewski regarding the opinions of these other experts, or otherwise respond to the opinions contained in the affidavits, with sufficient time to comply with the summary judgment schedule or case management deadlines.

- *Are less stringent alternatives appropriate and effective to protect the interests of the parties?* Less stringent alternatives may have been available in theory, but they would not have been effective to protect the interests of Prompt and SJRMC. Moreover, the fact that less stringent alternatives were available does not mean that the trial court was *required* to use those alternatives.

- *Will the opponent be unduly surprised and prejudiced by the inclusion of the witnesses' testimony despite the available and reasonable alternatives (e.g., a recess or continuance) to allow the opponent to interview the witnesses and conduct further investigation?* The only viable alternative would have been to suspend summary judgment proceedings to allow Prompt and SJRMC time to conduct discovery regarding these newly disclosed experts. But the Estate had argued strenuously that the case should be tried as soon as possible, fighting against any delays.

In sum, we do not find that these five factors show that the trial court erred by deciding that the appropriate sanction for the untimely disclosed experts was to strike their affidavits.

# B. Causation

[24] Medical malpractice claims are no different from other kinds of negligence cases regarding the elements a plaintiff must prove, meaning that the plaintiff

must show (1) the existence of a duty owed to the plaintiff by the defendant; (2) breach of that duty by allowing conduct to fall below the applicable standard of care; and (3) a compensable injury that was proximately caused by the defendant's breach of duty. *Hassan v. Begley*, 836 N.E.2d 303, 307 (Ind. Ct. App. 2006). When a unanimous medical review panel opinion is designated as evidence by a party on summary judgment, the non-movant must present expert testimony to rebut the medical review panel's opinion. *Scripture v. Roberts*, 51 N.E.3d 248, 252 (Ind. Ct. App. 2016).

[25] Where an affiant's deposition and affidavit are in conflict, "the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Crawfordsville Square, LLC v. Monroe Guar. Ins. Co.*, 906 N.E.2d 934, 939 (Ind. Ct. App. 2009).

[26] As evidence supporting summary judgment, Prompt and SJRMC both designated the unanimous opinion of the medical review panel that the conduct of Prompt and SJRMC was not a factor in Kimberly's resultant damages. Appellant's App. Vol. IV p. 129-31. This constituted prima facie evidence negating the existence of a genuine issue of material fact regarding one of the negligence elements the Estate must prove—causation—thereby shifting the burden to the Estate to designate evidence to show that there is, indeed, an issue of fact, rendering summary judgment improper.

[27]    In Dr. Pilewski's affidavit, he attested that Prompt's and SJRMC's "failure to meet the appropriate standard of care was a substantial factor of the resultant harm caused to Kimberly [] resulting in her death." *Id.* at 7. During his deposition, however, he equivocated:

- Kimberly's sedation medication ran out during the long ambulance ride, followed by a period of instability. Dr. Pilewski stated that "I can speculate without being able to prove or provide a causal relationship, but I can speculate that this [period of instability] happens when people become unstable on a ventilator." *Id.* at 144.

- Dr. Pilewski attested that, with respect to the pneumonia subsequently developed by Kimberly, "I can't say with any certainty whether [the period of instability] made her pneumonia worse. Ultimately she died from pneumonia. Can I say that period of instability made her pneumonia worse? No. I can speculate that it may have, but I can't say that there is a clear-cut causal relationship there." *Id.* at 144-45.

- Noting that Kimberly was difficult to properly ventilate upon being admitted to the ICU, Dr. Pilewski stated that "[w]e had a harder time managing her, and I could come up with a bunch of different reasons why that might be the case." *Id.* at 145.

- Dr. Pilewski attested that "your next question is probably going to be would the outcome have been any different if she was delivered directly to [the correct hospital]? And the answer is, I don't know. My guess is the same thing would have happened." *Id.* at 146-47.

- Counsel asked Dr. Pilewski, "Can you say that it's more probably true than not in your medical experience that [the result might have been different had Kimberly been timely delivered to the correct hospital], or again is that just speculation?" Dr. Pilewski agreed that it was just speculation. *Id.* at 148.

- Counsel asked Dr. Pilewski, "I'm correct in stating that it is not your opinion that Prompt caused Mrs. Snyder's death; correct?" Dr. Pilewski responded, "That is correct." *Id.* at 150.

In other words, at his deposition, Dr. Pilewski opined implicitly that SJRMC's decision to transfer Kimberly to Pittsburgh by ambulance and explicitly that Prompt's conduct during that ambulance ride did not, in fact, cause Kimberly's death. And while he might believe that the outcome would have been different had the disastrous ambulance ride not occurred, he conceded that any such belief is based on pure speculation.

[28] As noted above, to the extent that the deposition testimony conflicts with the affidavit, we disregard the affidavit unless it appears that the witness was somehow mistaken in his deposition answers. *Crawfordsville*, 906 N.E.2d at 939. Nothing in this record indicates that Dr. Pilewski misspoke or misunderstood the questions at his deposition; to the contrary, he repeatedly and clearly indicated that he did not believe that Prompt or, by implication, SJRMC, had caused Kimberly's death. Therefore, the trial court correctly focused on his deposition testimony rather than his affidavit with respect to causation.

[29] The Estate did not designate any other evidence disputing the medical review panel's unanimous opinion that the conduct of Prompt and SJRMC was not a factor in Kimberly's death. Therefore, we can only conclude that the undisputed evidence in the record shows that, whether or not SJRMC or Prompt breached the standard of care, their actions did not proximately cause

Kimberly's death. Consequently, the trial court did not err by granting summary judgment in favor of Prompt and SJRMC.

# II. Dismissal of Humana

[30] The trial court granted Humana's motion to dismiss for failure to state a claim under Trial Rule 12(B)(6). When reviewing such a ruling, we must consider the complaint in the light most favorable to the nonmovant. *Greer v. Buss*, 918 N.E.2d 607, 614 (Ind. Ct. App. 2009). A complaint should be dismissed pursuant to this rule only if it is apparent that the facts alleged in the complaint are incapable of supporting relief under any set of circumstances. *Lawson v. First Union Mortg. Co.*, 786 N.E.2d 279, 281 (Ind. Ct. App. 2003).

[31] This portion of the appeal calls upon us to review and interpret federal statutes. The interpretation of a statute is a question of law to which we apply a de novo standard of review. *Kaser v. Barker*, 811 N.E.2d 930, 932 (Ind. Ct. App. 2004).

# A. Medicare Part C

[32] Medicare is a federally subsidized healthcare program that is primarily for people over the age of sixty-five and individuals who have a disability. 42 U.S.C. § 1395c. Medicare has four parts; relevant to this case is Part C, which was added by Congress in 1997. Under Part C, Medicare beneficiaries may sign up for a privately administered healthcare plan (originally called a "Medicare + Choice" plan but later renamed a "Medicare Advantage" plan), which provides all of the benefits included in Parts A and B as well as additional benefits. 42 U.S.C. §§ 1395w.

[33]     If a beneficiary elects to participate in a Part C plan, the government pays the plan's administrator (here, Humana) a flat monthly fee to provide all Medicare benefits for that beneficiary. Because Part C limits the government's responsibility to the monthly fee, the private health plan assumes the risk associated with insuring the beneficiary. *E.g.*, *In re Avandian Mktg.*, 685 F.3d 353, 357-58 (3rd Cir. 2012). Part C plans must comply with "national coverage determinations" and "[g]eneral coverage guidelines included in original Medicare manuals and instructions . . . ." 42 C.F.R. § 422.101(b).

[34]     In 1997, when Congress first enacted Medicare Part C, the statute included a preemption provision. As originally enacted, the statute provided that "[t]he standards established under this subsection shall supersede any State law or regulation . . . with respect to Medicare + Choice plans . . . *to the extent such law or regulation is inconsistent with such standards*." 42 U.S.C. § 1395s-26(b)(3) (2000) (emphasis added). The statute also identified certain specific areas of state law that were "superseded under this paragraph." *Id.*

[35]     In 2003, Congress amended the statute, making the preemption provision much broader. That provision now provides that "[t]he standards established under this part shall supersede *any State law or regulation* (other than State licensing laws or State laws relating to plan solvency) with respect to [Medicare Advantage] plans which are offered by [Medicare Advantage] organizations under [Part C]." 42 U.S.C. § 1395w-26(b)(3) (2005). The phrase regarding "inconsistent" state laws and regulations and the subsection identifying specific standards that were superseded have been deleted.

## 2. Preemption

The supremacy clause of the United States Constitution vests Congress with the power to preempt state law. U.S. Const., art VI, cl. 2. Preemption of state law can be express or implied. It is express "when Congress positively enacts a preemption clause displacing state law; it is implied when courts infer a congressional intent to displace state law under one of three doctrines of 'implied preemption'—namely, 'field, conflict, or obstacle preemption.'" *Roberts v. United Healthcare Servs., Inc.*, 206 Cal. Rptr. 3d 158, 164 (Cal. Ct. App. 2016) (quoting *Quesada v. Herb Thyme Farms, Inc.*, 361 P.3d 868, 512 (Cal. 2015)). When preemption is implied, we employ a presumption against preemption when assessing Congress's intent. *Id.* at 164. But the United States Supreme Court has made it clear that when a statute includes an express preemption clause, "we do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S.Ct. 1938, 1946 (2016) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011)).

Here, as noted above, Medicare Part C includes an express preemption clause. Consequently, we must focus on the plain wording of that clause. And that wording could not be clearer: "[t]he standards established under [Part C] shall supersede *any State law or regulation* (other than State licensing laws or State laws relating to plan solvency) with respect to [Medicare Advantage] plans which are offered by [Medicare Advantage] organizations under [Part C]."

U.S.C. § 1395w-26(b)(3) (emphasis added). Adding even more clarity to that language is the previous version of the statute, which was far narrower regarding what state laws were preempted by Part C. The current version of the statute clearly shows that Congress intended to preempt a broad swath of state laws and regulations with Part C.

[38] As a result, state standards are preempted when they implicate "conduct that was governed by federal Medicare standards." *Haaland v. Presbyterian Health Plan, Inc.*, 292 F. Supp. 3d 1222, 1231 (D.N.M. 2018). Put another way, "as long as a federal standard exists regarding the conduct at issue," state law must yield. *Morrison v. Health Plan of Nev.*, 328 P.3d 1165, 1169 (Nev. 2014). Multiple courts have found that the broad language of the Part C preemption provision extends to claims that are grounded in state common law. *See, e.g.*, *Uhm v. Humana, Inc.*, 620 F.3d 1134, 1156 (9th Cir. 2010) (concluding that some state common law claims fall under Part C's preemption clause); *Haaland*, 292 F. Supp. 3d at 1230-31 (finding that negligence claims were preempted); *Morrison*, 328 P.3d at 1171-72 (same).[4]

---

[4] The Estate directs our attention to two cases reaching a different result, but both are inapposite. *See Ardary v. Health Plans of Cal., Inc.*, 98 F.3d 496 (9th Cir. 1996) (decided before Part C and its preemption provision were enacted); *Woodruff v. Humana Pharmacy, Inc.*, 65 F. Supp. 3d 588 (N.D. Ill. 2014) (analyzing whether "complete preemption," a jurisdictional doctrine allowing certain cases to be removed to federal court, which is not at issue in this case, applies to Part C).

# 3. This Case

In this case, the Estate alleged in its amended complaint that Kimberly's injuries and death were a "direct and proximate result of the carelessness and negligence" of Humana. Appellant's App. Vol. II p. 87. In its response to Humana's motion to dismiss, the Estate emphasized that its claims against Humana are state law negligence claims under Indiana's Wrongful Death Act, clarifying that its claims are based on Humana's denial of coverage for Kimberly's air transportation to Pittsburgh. Appellant's App. Vol. III p. 224, 232-34.[5]

To evaluate these tort claims, therefore, a court would have to turn to the Medicare rules as to coverage of patient transportation. Medicare "covers ambulance services, including [airplane] and [helicopter] ambulance services, only if they are furnished to a beneficiary whose medical condition is such that other means of transportation are contraindicated." 42 C.F.R. § 410.40(d)(1). In other words, the beneficiary's "condition must require both the ambulance transportation itself and the level of service provided." *Id.* This determination, therefore, is individualized and based on the facts of each case.

Consequently, to decide whether air transportation was required in Kimberly's case, Humana had to conduct a case-specific inquiry to determine whether air

---

[5] To the extent that the Estate implies in its brief that it has also raised a breach of contract claim against Humana, appellant's br. p. 35-36, we note that its complaint clearly and explicitly raises only claims that sound in negligence.

transportation was medically necessary—in other words, whether ground transportation would have endangered her health. *Id.* The Estate argues that the result reached by Humana—that ground transportation was not contraindicated—was negligent under Indiana law. But to resolve this argument, a court would have to apply a state law standard of care to a coverage determination governed by federal law. Indeed, if allowed to stand, the Estate's complaint could theoretically allow Humana to be found negligent even if it fully complied with all federal laws and regulations. Under these circumstances, we can only conclude that the Estate's claims, which sound in state law that must be applied with respect to Medicare Part C, are preempted pursuant to Part C's express preemption provision.[6] Therefore, the trial court did not err by granting Humana's motion to dismiss.[7]

[42] The judgment of the trial court is affirmed.

Najam, J., and Robb, J., concur.

---

[6] The Estate neither sets forth the federal standard nor argues that Humana failed to meet that standard in its coverage determination.

[7] Because we find that the claims against Humana are preempted, we need not and will not consider its argument that it is entitled to official immunity for its actions in this case.